## THE CITY OF SAN ANTONIO v. R. S. GOULD.

|34|49|
|38a|586|

1. The case of the city of San Antonio v. Jones, (28 Texas, 19,) approved in so far as it decides that it was competent for the Legislature of this State, while the Constitution of 1845 was in force, to authorize a municipal corporation to subscribe to the capital stock of a railroad company, and to issue bonds and levy taxes for the liquidation of its subscription, if two-thirds of the electors of the corporation should vote in favor of the subscription, at an election to be held for the purpose.

2. The Constitution of 1845, article 7, section 24, provided that every law enacted by the Legislature should embrace but one object, which object should be expressed in its title. *Held*, that this provision was not merely directory to the Legislature, but was mandatory, and it is to be enforced by the courts. The ruling in Cannon v. Hemphill (7 Texas, 184) to the same effect, approved.

3. In 1850, the Legislature passed an act entitled "An act to incorporate the San Antonio Railroad Company;" of which act all of the provisions, except those contained in one section, conferred the ordinary and appropriate powers, rights, and privileges incident and adequate to such a franchise. But by the twelfth section of the act it was enacted that the city of San Antonio and other incorporated towns on the line of the road, and also the several counties through which it should pass, might

subscribe to the capital stock of the railroad company, and issue bonds or otherwise pledge their faith to pay for the same, provided that two-thirds of their respective electors should vote in favor of the subscription, at elections to be held for the purpose. *He'd*, that these provisions are extraordinary and not such as are necessary to or usually engrafted upon a railroad charter, and the section itself, if regarded as a separate enactment, would properly be entitled " An act to provide the means for building the railroad ;" and it was therefore repugnant to section 24 of article 7, of the Constitution of 1845, then in force and above cited.

4. With respect to the modes in which corporations aggregate may execute contracts, a broad distinction is taken and maintained by the authorities between trading and municipal corporations. The former are permitted to incur many liabilities without using their common seal, which the latter are not otherwise permitted to incur ; and notwithstanding that the rule of the common law on this subject has received many modifications in this country, yet no case has been found in which a municipal corporation has been permitted, otherwise than by its common seal, to issue its negotiable bonds for the liquidation of its subscription to the stock of a company.

5. The facts and circumstances of the present case are reviewed by this court, with reference to the inquiry whether the plaintiff can be considered a *bona fide* holder of the municipal bonds sued on, so as to exonerate him from equities or frauds between the original parties ; and it is strongly intimated that he cannot be so regarded, although no actual knowledge or notice was brought home to him by direct evidence.

APPEAL from Bexar. Tried below before the Hon. George H. Noonan.

This case was decided in the court below at the October term, 1870. For all professional purposes the opinion of this court states the material facts. Should fuller information of the enterprise which engendered the litigation be desired, it can be had in the report of the similar case to be found in 28 Texas, 19.

*Davis & Murphy*, for the appellant.—1. In this case certain coupons were sued on, which, it is alleged, should be paid by the city of San Antonio. Suits concerning this same class of coupons and the bonds to which they were attached have already been be-

fore this court in two instances—San Antonio v. Enoch Jones, 28 Texas, 19, and San Antonio v. Wm. G. Lane, in the Supreme Court, Austin term, 1869.

In the case in 28 Texas, it will be noticed that a large part of the foundation of the defense of the city was conceded and admitted away by the counsel in that case acting for the city. In the report, page twenty-eight, appears the following: "On the trial it was admitted that an election was held in accordance with the terms of the twelfth section of the charter, on the last Monday of December, 1850, and that at San Antonio two-thirds of the qualified voters of that city voted in favor of taking $50,000 of the capital stock of said road; that thereupon the bonds to that amount, and the coupons in controversy, were signed and delivered to said company by C. F. King, the mayor of the city." None of these circumstances are admitted in the suit at present under consideration; on the contrary, the pleadings especially deny them, and evidence was offered to sustain such denial. In other respects, too, the case in 28 Texas was presented in a very different shape. New and additional good grounds of defense are raised in the present suit, and evidence given (or offered to be given) in support of the same. This court, however, in that suit, let drop expressions which showed that its decision might have been very different had the case borne the appearance of that now before the court. (28 Texas, 32, et seq.)

In the case mentioned as decided at Austin term of 1869, the political events of the time were not favorable to a calm and unprejudiced judgment. The judgment was rendered in the fall of 1869, at a time of much excitement caused by the political contest then pending. Several of the judges were personally interested in the election then about to take place. One of them was a candidate in opposition to one of the counsel of the city, and another, at least, (the judge who rendered the decision) was a decided partisan of his learned brother. These circumstances it is

necessary to recollect in order that the said decision may receive no more consideration than it is fairly entitled to, but they are referred to only because we believe that our duty to our client, and a correct understanding of her case, requires it. The decision was, perhaps, no more than another illustration of the weakness of human nature.

But aside from the peculiar circumstances under which the said decision was made, in that case as in the case in 28 Texas, the issues presented below and apparent here upon the record, differed materially from those presented in the present case. A comparison of the respective records will make this apparent. The case is, therefore, in no respect, a precedent for the decision of this one. We will, however, comment briefly on the position assumed, in one important respect, by the judge in that case. He says : "It is assumed as well settled, that the Legislature may authorize municipal corporations to subscribe for stock in railroad companies and to provide for the payment of such subscriptions in such manner as may be acceptable to the corporation, provided it be not repugnant to the Constitution." Let us take it for granted (for argument sake) that this is a correct statement of the law, and the facts as presented in the record now before this court show that the bonds and coupons were null and void because issued to a company which had ceased at the time to exist. On this point, it will appear that the testimony of all the witnesses introduced by the defense, who speak to this matter, is emphatic that the terms of the railroad charter (San Antonio and Mexican Gulf) had not been complied with, and said charter, by its own limit, had expired and become a nullity when the bonds and coupons were issued. Yet, say the holders of these bonds and coupons, " granted that the facts are as you say, still the bonds and coupons are good, because the Legislature subsequently revived and continued the railroad charter." In plain English they assume that the Legislature, by action had long subsequently, can make good

these bonds issued without authority, and to a corporation that had, when issue was made, ceased to exist, and which bonds are further accompanied by every indicia of fraud! This proposition carries with itself its condemnation.

We will now pass to the consideration of the features presented by the case now before the court, and the law applicable to those features. Appellants plead "*non est factum*," and under this plea the want of the common seal of the city corporation to the bonds and coupons was a good objection to their admissibility. (Angel & Ames on Corporations, §§ 217, 223.) When these bonds were issued the common law rule in reference to seals was in full force, and the law of February 2, 1858, (Paschal, 852) especially excepts corporations from the effect of its provisions, abolishing the use of seals in many cases. The corporation of San Antonio could only act in such a matter as this by their common seal, which the act of incorporation of that city provided for, and it is well settled that the people of a city are not bound by the acts of their agents outside of the defined limits of their authority. (Clark v. Corporation of Washington, 12 Wheaton, 40.) And where a corporation relies upon a grant of power from the Legislature for authority to do an act, it is as much restricted in respect to the mode of exercise of this authority, as it is restricted in respect to the thing allowed to be done. (Farmers' Loan and Trust Co. v. Carroll, 5 Barb. N. Y. R., 613; Clarke v. City of Rochester, 13 Howard, 204; Brown v. City of Utica, 3 Barb. S. C. R., 104.) In the language used in 4 Peters, 152, (Beatty v. Lessee of Knowles) by the Supreme Court of the United States: "The exercise of the corporate franchise being restrictive of individual rights, cannot be extended beyond the letter and spirit of the act of incorporation." (Also, see Jackson v. Ostrander, 1 Cowen, 686; Utica Insurance Co. v. Scott, 19 Johns., 1.)

2. The appellant objected to the introduction and reading of section twelve of the act incorporating the San Antonio and Mexi-

can Gulf Railroad, on the ground that same was unconstitutional. Notwithstanding the case of Tadlock v. Eccles, 20 Texas, 792, and the case of Chiles v. Drake, 2 Met., Ky., 146, quoted by the judge in the Wm. G. Lane case, (Austin term, 1869,) as fully sustaining the constitutionality of said twelfth section, it is impossible, in a fair construction of said section, to perceive any analogy between it and the cases alluded to. In Tadlock v. Eccles, 20 Texas, the act objected to was, "An act to consolidate the Texas Monumental Committee, and the Texas Military Institute with Rutersville College." This was clearly the sole object of the act, and it was clearly expressed in the title. The act incorporating the railroad is entitled, "An act to incorporate the San Antonio Railroad Company."

Section twenty-four, article seven, of the Constitution of the State, reads: "Every law enacted by the Legislature shall embrace but one object, and that shall be expressed in the title." In so far as the incorporation of the San Antonio and Mexican Gulf Railroad Company, and its distinctive object and title are concerned, it is clear that if the law embraces but the one object of the incorporation of the said railroad company, it could not be held subject to objection of unconstitutionality. But how does the twelfth section bear this test? Is it for the object embraced in the title of the act, or is it variant from and for a different purpose and object? The twelfth section is in evidence, and we think that it does not require more than an ordinary familiarity with the English language to detect that it has another object, and a different one from that expressed in the title.

As we read this section it was, in as far as applicable to the city of San Antonio, in words (and emphatically in effect) an enlargement of the charter of the city of San Antonio:

First—It gave authority to the mayor and board of aldermen of the city of San Antonio to subscribe to the capital stock of said company, to an amount not to exceed fifty thousand dollars.

Second—It gave similar power to various others of incorporated towns, to issue bonds bearing interest, etc.

Third—It gave authority to chief justices and county commissioners to subscribe for stock, etc.

Fourth—It gave authority to all of said municipal bodies and corporations to pledge the faith of the cities, towns and counties to pay for the same.

Fifth—It provided for elections, and regulated the mode and manner of conducting the same.

Sixth—It enlarged the powers and duties of mayors of said cities and towns, and also of the chief justices of counties.

Seventh—It created a tax law, and provided a method of enforcing and collecting taxes, and of disbursing the same.

Said section being nothing less than an omnibus. The act is, therefore, clearly unconstitutional, at least to the extent of the twelfth section. The case of Cannon v. Hemphill (7 Texas, 208) is directly in point; see also Mayor v. The State of Georgia, 4 Ga., 38.

3. The appellant insists further that even if the appellees had a legal claim against appellant, the proper remedy was not a suit of this nature, but by mandamus to compel assessment and collection of a tax, as required by said twelfth section of the railroad charter. The writ of mandamus lies as a private remedy to compel the performance of official duty, where this duty is plain and there is nothing left to the discretion of the officer. (Com. Gen. Land Office v. Smith, 5 Texas, 471 ; Glasscock v. The Commissioner, 3 Texas, 51.) It will issue to an officer when the duty to be performed is ministerial in its character. (Id., and authorities collated in note 528, Paschal's Digest ; The People v. Mayor of Chicago, 51 Ills.) How shall such a judgment as this be enforced if it is allowed to stand ? By seizing and selling the city hall, or the public streets and squares. The general demurrer should have been sustained on this ground alone.

4. Appellants claim that the coupons were inadmissible, for the reasons set forth in Bill of Ex. No. 2, as they do not appear on their face, or otherwise, to be connected with the San Antonio and Mexican Gulf Railroad. It will appear on inspection of the coupons that they are not, under our statute law, negotiable paper, neither were they assigned to the plaintiff by the railroad company. No foundation was laid for their introduction in evidence by the plaintiff below, under his own pleadings. It is therefore submitted, that the holder of an instrument negotiable may maintain suit in his own name, but he must show his right to the paper either by indorsement or proof of ownership. (Marlin v. Manning, 2 Texas, 351; Heard v. Lockett, 20 Texas, 163; Ross v. Smith, 19 Texas, 172.)

The holder must have a *bona fide* assignment, valid in law, from the owner. (Ross v. Smith, 19 Texas, 172.)

5. In proceeding with the points raised in this case, we will pass to the next error in order, to which special attention is invited, because we hold that under the liberal provisions of the law, " the defendant, in his answer, may plead as many several matters, whether of law or fact, as he shall think necessary for his defense, and which may be pertinent to the case, provided he shall file them all at the same time, and in due order of pleading." (Paschal's Digest, article 1441.) Testing the answer by this law, it is difficult to understand why the proof offered by the appellant should have been refused. The answers, it is submitted, are broad, clear and full enough. Under these pleadings, the plaintiff is charged as confederating with the pretended officers of the pretended San Antonio and Mexican Gulf Railroad Company, and with the president, employés and agents thereof, to defraud, oppress, harass, and annoy defendant, and that he did fraudulently and wrongfully obtain possession of the coupons, well knowing at the time that the same were void and worthless, and were issued, if issued at all, without consideration, and would not be paid by defendant.

The plaintiff is further charged in the answers, with a full knowledge that at the date of the issuance of the coupons, "there was no such railroad company as the San Antonio and Mexican Gulf Railroad Company, and that C. F. King, mayor, had no authority, in law, to sign or issue the same to the railroad company."

The exclusion of the oral and written evidence offered by appellant on the trial of the cause, as embraced in the said bills of exception Nos. six to ten, deprived the defendant of a legal defense to plaintiff's action.  A proper foundation was laid for its introduction in the answers, but the court by its rulings shut up every avenue of defense.  It is confidently submitted that the evidence offered and refused by the court was proper evidence to be considered and weighed by the jury, being facts that affected the appellee under the allegations in the answer.  Had not the court prevented the evidence from going to the jury, there is no doubt but that the verdict would have been for appellant, as it should have been.

By these extraordinary rulings, the court substantially said to appellant, " You shall pay these coupons, though there was no election, and the people of San Antonio never had a chance to vote on the question, as required by the charter; though the pretended railroad to which they were issued was a myth; though they were fraudulently issued and were repudiated immediately by the city; though all the world knew of the fraud and the nullity of the proceedings on which the issue was had; and, though the railroad authorities many years after their issue, still being in possession of them, offered to return them to you for a mere fraction of their face value; though, finally, the present holder comes with all these suspicious circumstances attached to his possession of them, I will make you pay the utmost farthing of their face value."

Such rulings as these, if persisted in, will bind hand and foot, and turn over the people of cities and town, counties, and even the States themselves, to the hands of the rapacious swindlers who now infest the land in the shape of railroad corporations.

The decisions of the courts seem heretofore to bear the impress of being dictated by those corporations, until, in some parts, the people are seriously discussing the possible necessity of revolutionary resistance to their ever increasing demands.

It is submitted, however, that the case under consideration is exceptional in its peculiarly outrageous fraud and swindling, and that if the courts ever intend to put bounds to the tendency of the decisions, this is an appropriate case to make the stand upon.

We know that the answer is always ready—"Well, though the railroad may have been a fraud; though there may have been no such corporation at the time in existence; and though the bonds may have been issued totally without authority and by collusion, and were immediately, persistently and notoriously repudiated by you; and though all this went on and was public for years before I purchased, still I am a good faithholder, and must be protected;" but, with respect, we have to say that the plea of good faith is worse than nonsense, coming from any holder of these bonds and coupons, in the light of the evidence given by all the witnesses. This evidence that was allowed to go in, alone must satisfy any unprejudiced minds that no one could be an innocent purchaser, unless he was an idiot.

We think that there are a dozen objectionable rulings of the judge in the progress of this case, which would warrant its being reversed and remanded. Though the amount in question in this suit is small, the issue interests the people of San Antonio, city and county, to the extent of a quarter of a million dollars. Let the case go back to the district court, and let the door then be opened to the admission of all proof necessary and proper to show up this gigantic swindle.

We will on this subject close, by calling the attention of the court to some features of the cases where the United States Supreme Court has made decisions, in regard to similar bonds and coupons, which apparently conflict with the doctrine as maintained

by us—these decisions being mainly relied upon by appellee, to sustain his case. In the cases of Mercer county v. Hackett, 1 Wallace, 83; Gelpecke v. City of Dubuque, Id., 221; Meyer v. City of Muscatine, Id., 384; Murray v. Lardner, 2 Wallace, 110; Brainsen v. LaCrosse Railroad Company, Id., 283; Thompson v. Lee county, 3 Wallace, 327; Rodgers v. Burlington, Id., 654, and also in the cases in Howard's Reports. On this subject, a material difference appears on comparison with the one under consideration, in the following respects:

First—That in all these cases the decision was rendered on bonds and coupons issued to living and existing railroads, and not to any bogus concern, and that same were issued under authority of laws then valid and binding at date of issue.

Second—That the question of fraud, and almost all the other defenses plead by appellants, were not presented in those or any other cases heretofore decided by the Supreme Court of the United States.

Third—That no case presenting such peculiar and notorious characteristics of swindling on a large scale, is found among those cases, or was before this brought before a court of justice, in connection with this business of issue of city and county bonds and coupons.

Fourth—That the reasoning of the judges who delivered the opinion of the court, in those cases in Wallace and Howard, if carefully scrutinized, will be found to sustain appellant's defense, and shows that if such grounds of defense had been therein presented, a different decision would have probably resulted.

*Wælder & Upson*, for the appellee.—Bonds, with coupons, payable to bearer, are negotiable securities, and pass by delivery; and, in fact, have all the qualities and incidents of commercial paper. (Thompson v. Lee County, 3 Wallace, 331.) Bonds and coupons like these, by universal commercial usage and consent, have all

the qualities of commercial paper. (Gelpecke v. City of Du-
buque, 1 Wall., 202; Commissioners of Knox County v. Aspin-
wall, *et als.*, 21 Howard, 539.)   We might cite other and numer-
ous authorities upon this point, but will close with the language
of this court, in the case of the City of San Antonio v. Lane:
"It is well settled, indeed it may be regarded as no longer an
open question, that bonds and coupons of this character are nego-
tiable paper, transferable on delivery."

That the plaintiff had a remedy by mandamus may be true.
We are not disposed either to assent to or deny the proposition.
The coupons sued upon being an obligation of the city he cer-
tainly had his action of debt.   This was the remedy he pursued,
and we submit, properly.   Whether or not it will hereafter be-
come necessary to resort to a mandamus to enforce payment re-
mains to be seen.

The bond referred to in the third paragraph of the assignment
of errors, was introduced merely to show the character of the
bonds, from which the coupons had been detached.   The case of
the plaintiff would have been fully made out without the intro-
duction of the bonds, for a suit could be maintained upon the cou-
pons, without the production of the bonds to which they had been
attached.   (Commissioners of Knox County v. Aspinwall, *et als.*,
21 Howard, 539.)   The possession of coupons is *prima facie*
evidence that the holder of them is holder of the bond, or was so,
at least, when they were cut off. (McCoy v. Washington County,
tried before Justice Grier in the County Court of the United
States, Western District of Pennsylvania, 7 volume Law Regis-
ter, 196.   See Ohio v. Commissioners of Clinton county, 8 Ohio
State R., Ritchfield, 280.)

Again: It is not necessary that the holder of coupons, in order
to recover on them, should own the bonds from which they are de-
tached. (Thompson v. Lee County, 3 Wallace, 331.)   And a
holder of coupons which have been cut off from the bonds to

which they were originally attached, may bring suit on them if they represent interest already due, notwithstanding he be no longer holder of the bond to which they belonged. (The City v. Lawson, 9 Wallace, 477.)

The fourth error assigned raises the question of the constitutionality of the twelfth section of the railroad charter, by authority of which the coupons sued upon were issued.

It might have been reasonably supposed that this question had been finally and satisfactorily settled by the previous adjudications of this court in the cases of the city of San Antonio v. Enoch Jones, and San Antonio v. W. G. Lane. In the former case the general authority of the Legislature to authorize stock subscriptions to railroads, by municipal corporations, is raised and very fully discussed. Chief Justice Moore, in delivering the opinion of the court, cites a large array of authorities sustaining this general power.

But, in this last case, it was further objected that the twelfth section of the railroad charter was obnoxious to that section of the State Constitution which provides that every law shall embrace but one object, and that object shall be expressed by its title.

" The object of the act incorporating the railroad company was to build a road, promoting alike the general good and the special interest of the city. The ultimate end or object of the act being the completion of a road, no lawful means or assistance in aid of this object, we apprehend, can be variant from the expressed object in the title." This court thus again upheld the constitutionality of the twelfth section, upon or against both objections, in the case of San Antonio v. Lane, and not yet published, as above stated.

Upon the second objection this court refer to the case of Chiles v. Drake, 2 Met. Ky., 146, and the case of Tadlock v. Eccles, 20 Texas, 792, where the court say: " It could not have been meant.

that the word ' object' should be understood in the sense of ' pro-
vision."    *    *    *    " Various and numerous provisions
may be necessary to accomplish the one  general  object which an
act of the Legislature proposes."

We beg leave further to refer to the following  decisions, made,
as is apparent, under similar constitutional provisions, to-wit:

The twenty fifth section of the fourth article of the Constitu-
tion, as to entitling statutes, is merely directory.  (Washington v.
Page, 4 Cal., 388.)   Statute of April 19, 1859, to enable the
supervisors to raise money by tax, is not unconstitutional, as con-
taining matters not embraced in its title, because it authorizes
them to obtain the reversal of judgments improperly rendered
against the city.  (Sharp v. New York, 31 Barb., 572.)

The statute of 1859, relating to the court of common pleas, and
the jurisdiction and compensation of its judges, was constitution-
ally enacted.  (Coburn v. Dodd, 14 Ind., 347.)

A provision in, or amendatory of, an act incorporating a college,
which prohibits the sale of ardent spirits within a distance of four
miles, although no such object or subject is named in the title of
the bill, is not unconstitutional.  (O'Leary v. Cook, 28 Ill., 534.)

We may be further permitted to add the words of Justice Miller
in the case of Seeling v. The City of Racine, tried in the United
States District Court of Wisconsin, and in which the question of
constitutionality was also raised.  He says : " It must be a very
clear and  unequivocal case to  induce a court to pronounce an act
of the Legislature unconstitutional or invalid.   It is by no means
the duty of a court of justice so to construe a statute as to retard
its operation, or to affect contracts made under it."    *    *    *    *
" This plaintiff is before the court as  a  bona  fide  holder of the
bonds and coupons, for a  valuable consideration, innocently paid
on the faith of the  validity of the act, and the court cannot, by a
technical construction of the act, release the city from the pay-
ment of a just debt.   Under the authority of the act the city

issued the bonds, and on the faith of it the plaintiff purchased them, and the court will not allow a supposed technicality to defeat the recovery of a debt thus honestly contracted." (8 Vol. Law Register, 606, 607.)

Again, although an act be unconstitutional and void, it will yet operate as an estoppel upon the party applying for and accepting it, and as notice to third persons. (Robinson v. Bank of Darien, 18 Ga., 65.)

Supposing, then, that there was any irregularity in the issuance of the bonds and coupons (which there was not), how can this appellee be thereby affected? That he can not be, seems to be as well settled as any question that has been submitted for adjudication to the courts of the country. Says this court, in San Antonio v. Lane: "A *bona fide* holder, for a valuable consideration, cannot be held responsible for the misconduct or default of the parties issuing them (bonds and coupons of this character); such *bona fide* holder may well presume that every condition precedent to the issuance of the bonds and coupons has been complied with." (1 Wall., 203, 385; 27 Ill., 474; 24 How., 286.) Again, "the *bona fide* holder, discerning nothing to excite suspicion, coming in possession in due course of trade, may enforce payment, notwithstanding they may not be held valid as between the original parties." (Referring to Abb. Dig. Law Corp.; 127.) And further, says this court: "If there be fraud, irregularity or non-compliance with the rules laid down by the authority which sanctions the issue, the corporation may be restrained by injunction from issuing the bonds by any party in interest; but it is too late, after the bonds have fallen into innocent hands, to institute inquiries as to the qualifications of corporate electors, their number, or the day on which the election was held." And the court here refer to 27 Ill., 308; 3 Clarke, 311; 1 Wall., 385; 24 How., 287; 24 Ill., 75; 1 Wall., 197. "All that can be required of the *bona fide* holder is a knowledge of the law authorizing the issue." (33

Mo., 440; 29 Conn., 124; 1 Wall., 385; 25 Ill., 317.) "The city is concluded by its representations upon the face of the bonds in regard to its authority for issuing them, and cannot go behind them to show irregularities in the preliminary proceedings required by the act." (Seeling v. The City of Racine, 8 Law Reg., 605; Commissioners of Knox County v. Aspinwall, 21 How., 539.)

The foregoing citations, and the authorities which follow, are applicable to the sixth as well as the fifth error assigned by appellant, and we therefore continue to quote: " Where authority is given to a city to take stock in a road, provided the act be ' on the petition of two-thirds of the citizens,' this proviso will be presumed to have been complied with where the bonds show on their face that they were issued in virtue of an ordinance of council of the city, the bonds being in the hands of *bona fide* holders for value." (Van Horthrup v. Madison City, 1 Wall., 297.)

When a corporation has power, under any circumstances, to issue negotiable securities, the *bona fide* holder has a right to presume they were issued under the circumstances which gave the requisite authority, and they are no more liable to be impeached for any informality in the hands of such holders than any other commercial paper. (Gelpecke v. City of Dubuque, 1 Wall., 203.)

A county or other municipal corporation, being authorized by statute to borrow money and issue bonds for the payment thereof, * * * the county is estopped to deny their regularity or to assert that they were not made in conformity to the statute. (Moran v. Commissioners of Miama County, 2 Black., 722.)

When the bonds on their face import a compliance with the law under which they were issued, the purchaser is not bound to look further. (Mercer County v. Hackett, 1 Wall., 93.)

It is settled law, that a negotiable security of a corporation, and in conformity with the provisions of its charter, is valid in the hands of a *bona fide* holder, without notice, although such security

was issued for a purpose and at a place not authorized by the charter of the corporation. (Supervisors v. Schenck, 5 Wall., 784.)

But it is said that the city received no consideration for the coupons. We answer again, that if this be so the innocent holder cannot be injured in his rights. We may, and do submit, however, that the question of failure of consideration would hardly be a good defense in a suit upon bonds of this character, under any circumstances. It must be borne in mind that these bonds and coupons were issued in payment of the stock subscribed. The city, by its subscription of stock, became the principal stock-holder of the railroad company; had a controlling voice in the management of its affairs, and all that was done by the railroad company—whether done reularly or irregularly, honestly or dis-honestly, in good faith or fraudulently—was participated in by the city. If the road was a failure, that was not a failure of the con-sideration of the city's bonds and coupons. If the railroad char-ter was forfeited by the fault of the company, (which it was not, as we have already shown,) the city was a part, and the principal part of the company, and was itself at fault. The same remarks apply to the non-commencement of the road within a year, and the non-completion of twenty miles of it within three years. If any of the transactions of the company were fraudulent, the city was, as a stockholder, a party to the fraud. However notorious the failure to build the road may have been, such notoriety cannot affect an innocent holder. That the bonds were never used by the company for the purpose of building the road has as little effect upon the rights of this appellee. Nor could his right to recover be defeated, because some or all of the bonds remained in the hands of the railroad company until the year 1857, nor by the further circumstance that negotiations may have been going on be-tween the company and the city for the surrender of the bonds by the one, and the surrender of the stock by the other. How far

such an arrangement by the officers of the company would have been legal and valid, it is not necessary to discuss here. We simply remark that it would not have released the city from any liability incurred as a stockholder to third parties.

How, again, could the failure to select a terminus at the coast defeat this appellee in his recovery upon these coupons? All of these are matters with which he has nothing to do.

We have already cited a number of authorities to sustain our position, but we cannot leave this branch of the case without referring to the following, believing that they and the cases already referred to are decisive of every point which can be raised in this case:

Such bonds, with interest warrants annexed, are commercial securities; * * * and as against one who has taken them in good faith, the county cannot set up the equities, which might have been available against the original payee. (Moran v. Commissioners of Miami County, 2 Black, 722; Knox County v. Aspinwall, 21 How., 539; San Antonio v. Lane, Austin term, 1869.)

Evidence of fraud, practiced by the railroad company to whom these bonds were delivered, and by whom they were paid to bona fide holders for value, cannot be received to defeat the recovery of the plaintiff. (Mercer County v. Hackett, 1 Wall., 93.)

It is not necessary, in a suit by the holder of the bonds or coupons, to show that a subscription was in fact made, the bond reciting the fact. (McCoy v. The County of Washington, 7 Law Register, 193.)

After the bonds passed into the hands of the railroad company the company was at liberty to sell them upon what terms they thought proper. (Meyer v. The City of Muscatine, 1 Wall., 392.)

Every objection which would have sustained an injunction, before negotiation of these bonds, cannot avail, after their negotiation against a bona fide holder or innocent purchaser for value. (Maddox et als. v. Graham et als., 2 Met. Ky. R., 56.)

The language of the court in this last case is so apposite to the case at bar that we feel justified in copying several paragraphs of the opinion. The Legislature of Kentucky, in 1850, incorporated the Maysville and Lexington Railroad Company. By an amendment to the act, made in 1851, the city of Maysville was authorized to subscribe stock and issue bonds therefor, which was done. In deciding the above case, arising upon the bonds so issued, the Court of Appeals of Kentucky held this language :

"That the railroad has failed; that the stock has lost all value ; that the company has become insolvent, and its franchises and property have been sold; that the corporation is defunct and no longer maintains an organization, through which to issue certificates of stock to tax payers, when entitled to them ; these may all be facts, and yet not facts which would constitute a good defense to an action upon one of the city bonds or upon a coupon. Nor do they constitute a defense upon which appellant can or ought, either legally or morally, to resist the relief sought against them.

"It has already been expressly decided by the Supreme Court of Iowa, 'that the purchaser of a county bond issued in payment of subscriptions to the capital stock of a railway corporation has nothing to do with the fact that the company, since the issuing of the bond, has become insolvent, or may have dissolved.' " (Clapp v. the County of Cedar, 5 Clarke, Iowa R., 15.)

"That the citizens of Maysville miscalculated as to the ability of the railroad company to achieve this darling enterprise of theirs; that they themselves have acted hastily, without prudent forethought and discretion, and have made a bad bargain·; that the money, for which the bonds were sold, was squandered by the company, and is a total loss, are no answer to the innocent and *bona fide* bondholder, who has parted with his money for them, when he demands payment of either principal or interest of the bonds.

"The city owes the debt, and is bound alike in law and good morals, to pay it, with the interest that accrues." (2 Met., 84.)

In the same case and in passing upon the question of the constitutionality of the laws, under which the subscriptions were made and the bonds and coupons issued, the court further says :

" In the case of Slack and others v. the Maysville and Lexington Railroad Company, the laws were decided not to be unconstitutional, notwithstanding the able and elaborate dissenting opinion of a distinguished member of the court. In the language of the Supreme Court of Pennsylvania in the case of the commonwealth by Thomas v. Commissioners of Alleghany County, (32 Penn. State R., 233,) we say : ' This question should be considered at rest. We cannot agree with counsel, that, because it is a constitutional question, it should be treated as always open. When the meaning of a constitution or a doubtful question has been once carefully considered, and judicially decided, the instrument is to be received in that sense, and every reason is in favor of a steady adherence to the authoritative interpretation.' "

· 'We will next consider the question of good faith, consideration and notice as applied to appellee. We refer to the general principle on this head, which cannot be controverted, and will not, we apprehend, be seriously questioned :

" A *bona fide* holder of a negotiable instrument, for a valuable consideration, without any notice of facts which impeach its validity, as between antecedent parties, if he takes it under an endorsement made before the same becomes due, holds the title unaffected by these facts, and may recover thereon, although as between the antecedent parties the transaction may be without any legal validity. And the holder of any negotiable paper, before it is due, is not bound to prove that he is a *bona fide* holder, for a valuable consideration, without notice, for the law will presume that in the absence of rebutting proofs. It is incumbent upon the defendant to establish, by way of defense, satisfactory proofs of the contrary, and thus to overcome the *prima facie* title of the plaintiff." (Swift v. Tyson, 16 Pet., 1 ; Goodman v. Simonds, 20 How., 343, 365.)

"It follows, as a necessary consequence, that if a bill of exchange, indorsed in blank so as to be transferable by delivery, be misappropriated by one to whom it was entrusted, or even if it be lost or stolen, and afterwards negotiated to one having no knowledge of these facts, for a valuable consideration and in the usual course of business, his title would be good, and that he would be entitled to recover the amount." (Goodman v. Simonds, 20 How., 365.)

"The possession of negotiable paper carries the title with it to the holder. The party who takes it before due, for a valuable consideration, without knowledge of any defect of title and in good faith, holds it by a title valid against all the world." (Goodman v. Simonds, 20 Howard, 343; Murray v. Lardner, 2 Wall., 110, 121.)

It may be insisted by appellant, as pointed at in the charges asked by him, that if the plaintiff had notice of the failure of the railroad company to commence and complete its road, as required by the charter, that the coupons were given without consideration, or that the consideration failed; that the coupons were repudiated by the defendant, or of their illegality or worthlessness in general market; that these coupons were issued without authority of law or were issued after the law authorizing their issue had expired; that he was put upon inquiry; that he did not receive these coupons in good faith, but had notice of the equities which had existed between the railroad company and the defendant; that, if he had notice of any or all of these things, he cannot recover in this suit.

What might be the consequence if the appellee had such notice we are not called upon to consider. We are fully warranted, we think, in the assertion that he had no such notice, "constructive or otherwise."

WALKER, J.—R. S. Gould brought his suit against the city of San Antonio to the October term, 1870, on sixteen interest cou-

pons, alleging that they were issued by said city in payment of stock in the San Antonio and Mexican Gulf Railroad, and which he avers to be his property, acquired in due course of trade, for a valuable consideration, and prior to their maturity.

It appears that the bonds and coupons were made and delivered to the railroad company on the first day of March, 1852, as is claimed, in pursuance of an act of the Legislature, approved September 5, 1850. A copy of one of the bonds is attached to the record and the coupons were set out in the petition, a copy of one of which reads as as follows :

" *City of San Antonio, Bonds.*—Due from the city of San Antonio to bearer, seventeen dollars and fifty cents, due first September, 1868, upon bond No.——, for $500.

"C. F. KING, Mayor."

On the trial of the cause in the district court, the appellee recovered a judgment for the sum of $377 74, that being the aggregate amount of the coupons sued on, with interest from their maturity.

From this judgment an appeal is brought to this court.

On the trial of the cause thirteen bills of exception were taken.

We shall only notice such of the exceptions to the rulings of the district court, as we deem necessary to the decision of the case.

The constitutionality of the act of September 5, 1850, is called in question by the pleadings. In the case of San Antonio v. Enoch Jones, 28 Texas, 19, it was urged that the legislative power was exceeded in the twelfth section of the act, and that so much of the act incorporating the San Antonio and Mexican Gulf Railroad Company as conferred upon the city of San Antonio the power to subscribe to the capitol stock of said company, to issue bonds and levy taxes, was unconstitutional and void.

This question was, as we think, properly settled upon authority against the appellant.

The question herein raised as to the constitutionality of the act under the twenty-fourth section of the seventh article of the Constitution of 1845, was not raised in the case; but it was in the subsequent case of the city of San Antonio v. William G. Lane, and was decided by this court, upholding the constitutionality of the law.

In neither of these cases was the plea of *non est factum* urged by defendant below; nor was the question of holding in good faith for a valuable consideration seriously made; and to these three questions we shall direct our inquiry.

The act of September 5, 1850, is entitled " An act to incorporate the San Antonio Railroad Company." The act consists of eighteen sections; they set out in detail the objects and purposes of the corporation, and define the powers and privileges ordinarily granted to companies of the kind; and these powers are very complete, full, and sufficient to have enabled the company to build and operate the proposed railroad without any reference whatever to the matters and things contained in the twelfth section of the act.

Inasmuch as the main question to be decided in this case arises under section twelve, we give it as follows:

" That the mayor and aldermen of the city of San Antonio be, and they are hereby authorized to subscribe to the capital stock of said company for said city, to an amount not to exceed fifty thousand dollars, as also such incorporated towns through which said railway may pass, inclusive of the town (if any) that may be its terminus on the gulf; and to issue bonds bearing interest, or otherwise to pledge the faith of said city or towns to pay for the same; and the chief justice and county commissioners of the several counties through which the railway may pass shall be, and they are hereby authorized to subscribe to the capital stock of said company for their respective counties to pay the same; *provided*, that the chief justice and county commissioners of said counties shall not make such subscription unless two-thirds of the qualified

electors of said county or counties, at an election to be held for
that purpose, shall vote in favor of such subscription being made;
and the chief justice of any such counties may order such electior.
to be held, and shall give notice of the time and object of such
election, by causing notice thereof to be posted up in each pre-
cinct of the county, at least thirty days before the holding of such
election; said election to be conducted in the manner regulating
county elections, so far as the same may be applicable; *provided,
also*, that said mayor and aldermen of the city of San Antonio,
and the towns upon the line and at the terminus of said railway
on the gulf, shall not make such subscriptions unless two-thirds of
the electors of said city or towns qualified to vote for, town or city
officers, at an election to be held for that purpose, shall vote in
favor of such subscription being made; and the mayor of said city
or towns may order such an election to be held, and shall give
notice by publication in the newspaper published in the city or
town for at least twenty days previous to such election being held;
and said elections shall be conducted in the same manner regu-
lating the respective city or town elections, so far as the same may
be applicable; *provided, further*, that where any such subscrip-
tions shall be made and bonds thereof be issued by the mayor and
aldermen of any of said towns or city, or by the chief justice and
county commissioners of any of said counties, it shall be their
duty, respectively, to provide for the punctual payment of the
interest that may from time to time become due upon the
same, and for the payment of the principal thereof by levy-
ing and collecting a tax on the real and personal property in
the city, town or county for which said subscription shall be
made, and bonds issued, which tax shall not be less than ten
cents nor more than fifty cents on each and every one hun-
dred dollars taxable property in said city, town or county,
and shall be assessed and collected and paid into the treasury of
said city, town or counties by which it is levied, in the same man-

ner the city or county tax in such city or towns or counties is assessed and collected, which tax shall be continued from year to year until the whole amount of the principal and interest due on said bonds shall have been fully paid and discharged; and when collected, after deducting therefrom the expenses of assessing and collecting, shall first be applied to the payment of the interest due on such bonds, and the remainder shall be applied to the payment of the principal on such bonds."

It will readily be seen that this section of the act is intended to enable the city of San Antonio, and other towns and counties, to become subscribers to the capital stock of the proposed San Antonio Railroad Company, directing the manner in which the stock shall be subscribed and paid. Now, if it can be made to appear that all those matters and things, provided for in the twelfth section, were necessary incidents to the building of a railroad from San Antonio to the Mexican Gulf; that they were part and parcel of the necessary provisions for building said road, then the argument in support of the opinion in San Antonio v. Lane becomes plausible; but we cannot adopt this theory of the law. A railroad might have been built in accordance with the provisions of the act without calling into use any of the measures proposed in the twelfth section. The plain and literal meaning of seventeen sections of the act make it an act of incorporation, the purpose of which is to build a railroad from San Antonio to the Gulf of Mexico, with the ordinary powers, rights and privileges incident to such a franchise.

The twelfth section of the act would properly, in itself, be styled " an act to provide the means for building such railroad;" but it is complicated and intricate, and would not ordinarily be found engrafted on a railroad charter, and especially not, unless some apt and appropriate allusion were made to it in the title of the act.

We therefore regard it as repugnant in a strong sense to the

twenty-fourth section of the seventh article of the Constitution of 1845.

The Supreme Court of the State of Ohio, adjudicating under a similar constitutional inhibition. say : " The provision in the Constitution, article 11, section ten, that no bill shall contain more than one subject, which shall be clearly expressed in its title, was incorporated into the Constitution for the purpose of making it a permanent rule of the houses, and to operate only upon bills in their progress through the General Assembly. It is directory only, and the supervision of its observance must be left to the General Assembly." (Pim v. Nicholson, 6 O. S., 176.) But our Supreme Court has held directly the opposite doctrine. (See Cannon, *et al.*, against Hemphill, *et al.*, 7 Texas, 184.)

The case of Tadlock v. Eccles, 20 Texas, 782, decided by the same learned court, is in no way inconsistent or repugnant to the former case. In that instance the law in question was entitled "An act to consolidate the Texas Monumental Committee and the Texas Military Institute with Rutersville College," and it was held that it embraced but one object within the meaning of the Constitution, namely : the consolidation of three different institutions into one. But the act of September 5, 1850, contains two objects at least : the one to incorporate a railroad company, the other to raise means under various appliances to build a railroad.

The case of Chiles v. Drake, (2 Metcalf's Kentucky R., 146,) and quoted by the learned judge who delivered the opinion in San Antonio v. Lane, is a case precisely analogous to that of Tadlock v. Eccles, and neither of them deny the authority of Cannon v. Hemphill, but clearly admit that in a proper case the constitutional inhibition would be mandatory.

We now pass to a consideration of the plea of *non est factum.* On the argument of this case there appeared to be some doubt as to the city of San Antonio having a common seal at the time she is supposed to have uttered the coupons sued on. The city was

incorporated by an act of the Republic passed January 14, 1842. By this act she is created a body corporate and politic; no mention is made specifically of a common seal. But she was reincorporated by an act of the Legislature passed January 24, 1852; and in this act the power is expressly given in the first section "to make and alter the common seal."

But the common law was in force in this State at the passage of the act of December · 5, 1850, and Mr. Kidd, in his work on corporations, enumerates among the powers and capacities which tacitly and without any express provision are considered inseperable from every corporation: first, perpetual succession; second, to sue and be sued, implead and be impleaded, grant and receive by its corporate name, and do all other acts as natural persons may; third, to purchase lands and hold them for the benefit of themselves and their successors; fourth, to have a common seal; and fifth, to make by-laws.

To these Chancellor Kent has added a sixth: the power of amotion or removal of members. (See Angel & Ames on Corporations, § 110.) We also make the following quotation from the same learned authority:

"The general rule in England seems, however, still to be, that a corporation aggregate cannot expressly bind itself except by deed, unless the act establishing it authorizes it to contract in another mode, or obviously contemplates that it shall so do, as make promissory notes, in order to attain the object or do the business for which it was created. Where 'a company, like the bank of England, or the East India Company, are incorporated for the purpose of trade, it seems,' says Mr. Justice Best, 'to result from the very object of their being so incorporated, that they should have power to accept bills, or issue promissory notes; since without such power, it would be impossible for either of these companies to go on.' We find, indeed, in Edie v. The East India Company, and from the Bank of England v. Moffat, that actions

on simple contracts have been maintained against these institutions, without the objection we are considering. If the contract, however, be executed, the general rule above stated does not seem to be applied; and hence assumpsit for use and occupation may be maintained by a corporation aggregate against a tenant who has occupied under them and paid rent. In Beverly v. Lincoln, it was held that a corporation aggregate might be sued in assumpsit on a contract by parol, express or implied, for goods sold and delivered; and in Church v. The Imperial Gas Company, that it made no difference as to the right of a corporation to sue on a contract made by them without seal, whether the contract be executed or executory. At all events, a suit brought by a corporation upon an executory contract is held, in England, to amount to an admission of record by them that such contract was duly entered into by them, so as to estop them from setting up, in a cross action, the objection that it was not sealed with their common seal. (See Fishmonger's Company v. Robertson, 5 Mann. & Grang., 192.) The English law on this subject is evidently in a state of slow transition. (See De Grave v. Monmouth, 4 Carr. & Payne, 111.) A distinction, however, is taken in this respect between a municipal corporation and the corporations of late established by charter or act of parliament, for the purpose of carrying on trading speculations; and where the nature of these latter has been such as to render the drawing of bills or the making of any other particular set of contracts necessary for the purpose of the corporation, the English courts have held that they would imply in those who are, according to the provisions of the charter or act of parliament, carrying on the corporation concerns, an authority to do those acts without which the corporation could not subsist. At the same time, they hold that a municipal corporation cannot enter . into an important contract to pay a sum of money out of the corporate funds, even to make improvements in the borough, except under the common seal." (See Mayor of Charlton v. Ludlow, 6

Mees. & Welsb., Ex. R., 815; S. C., 9 Carr. & Payne, 242; and see Arnold v. Mayor of Poole, 4 Mann. & Grang, 860; Hall v. Mayor & C., of Swansea, 5 Adolph. & Ellis, N. S., 526; Reg. v. Mayor Stamford, 6 Adolph & Ellis, N. S., 433; Paine v. Strand Union, 8 Adolph. & Ellis, N. S., 340; Reg. v. Council of Warwick, Id., 926.)

We are fully aware that this rule has been modified in Pennsylvania, in Kentucky, and perhaps in most of the States; but we are unable to find an instance where a municipal corporation has been permitted to do an act such as that alleged to have been done by the city of San Antonio, otherwise than by its common seal.

A broad distinction is kept up through the authorities between trading and municipal corporations: the former are permitted to do many things in the way of simple contracts, without the common seal of the corporation, which municipal corporations are not allowed to do.

Upon a careful examination of the facts in this case, we think it very doubtful if the appellee can be considered a *bona fide* holder of the coupons sued on, for a valuable consideration and without notice of outstanding equities. At the time the bonds were uttered it is very doubtful whether, in law, there was any such corporation in existence as the San Antonio and Mexican Gulf Railroad Company.

The bonds were uttered in the year 1852, and did not pass out of the hands of the railroad company until 1857, during which time it was attempted to revive and resuscitate the railroad company by an act of the Legislature, but the city of San Antonio neither lost or gained anything by this act, for it is not shown that she ever asked for it or acquiesced in it.

The corporation appears to have been rotten from the beginning. The subscribers would not pay their stock, the public had no faith in it. The city of San Antonio, by her common council, enacted a protest against the payment of principal and interest; the news-

papers of the city published it.    Two witnesses, Judge Devine and
Nathaniel Lewis, who went to the city of New York for the pur-
pose of disposing of these bonds, testify that the insolvency of the
railroad company was as notorious in the city of New York as it
was in the city of San Antonio; that the bonds of the railroad
company could not be sold at any price; that the bonds of the
city would not have brought more than twenty-five or thirty cents
on the dollar, and that not in money, but in carts, picks and bar-
rows.

This was in 1853, and the witnesses testify that the affairs of
the company grew worse from that time on.

It is a matter which the facts, as proven, bring into great doubt
whether any man in his senses would have purchased railroad or
city bonds which must necessarily derive their existence from some
law, and which depended for their value upon the solvency or in-
solvency of the corporation by which they are uttered, without ex-
amining into the condition of such corporations, and knowing all
about the nature of such securities.    Railroad and city securities
do not ordinarily pass from hand to hand like commercial paper;
they are usually thrown upon the market and sold like other
stocks, and are subject, like all other securities, to the vicissitudes
of the market, which are well understood by those who deal in
them.

We think the eleventh bill of exceptions well taken.

For the reasons given the judgment of the district court is
reversed and the cause dismissed.

                                        Reversed and dismissed.