NATHANIEL SIMPKINS, ALEXANDER AGASSIZ AND QUINCY A. SHAW v. JOHN E. WARD, COUNTY TREASURER, W. IRVING LATIMER, AUDITOR-GENERAL, AND SCHOOL DISTRICT No. ONE OF MICHIGAMME.

*Enlargement of school-districts—Taxation—Statutory construction.*

It has always been the policy of the Michigan school laws that no primary school-district should contain more than nine sections of land.

Township school inspectors cannot enlarge a graded school-district by adding unorganized territory, though they may, with the consent of the trustees, transfer to its jurisdiction territory previously organized into primary districts.

Statutes *in pari materia* must be construed together, and the meaning of later enactments determined by comparing them with the others.

Injunction lies to restrain the sale, for school taxes, of lands unlawfully included within the taxing district.

Appeal from Marquette. Submitted January 26. Decided April 13.

INJUNCTION to restrain tax sale. Dismissed on demurrer, but without prejudice. Reversed, and decree entered.

*Dan. H. Ball* for complainants.

*W. P. Healy* for the defendant school-district.

GRAVES, J. The complainants are owners of large bodies of wild land situated within the limits of the township of

Michigamme as at present organized. The lands are from two to twenty miles remote from any settlement and are as yet a part of a vast unbroken wilderness. After the township of Michigamme was organized the school inspectors proceeded to form school-district number one, embracing the village of Michigamme in sections nineteen and thirty of town forty-eight N., in range thirty W., and other lands immediately contiguous.

The district authorities subsequently converted it into a graded school-district. Prior to this change of *status*, which was self-effected, no enlargement of territory was possible beyond nine sections. But having changed the organization the trustees signified their willingness that the rest of the township should be added, and the inspectors, proceeding to act on this assent, made an order to attach the territory mentioned, which consisted of five surveyed townships of wild land.

The parcels owned by complainants belong to this tract, and in 1879 the district officers and other authorities treated them as lands taxable within the district and proceeded to rate them accordingly, and a tax for school purposes of the district other than the one mill tax was imposed. It was not paid and proceedings being taken to enforce it by means of a public sale under the direction of the Auditor General, complainants brought this bill to enjoin it. The defendants filed a general demurrer which was sustained by the circuit court and complainants appealed.

The general question is, whether the act of the school inspectors operated to incorporate complainants' land in the district; and the answer depends on the power of these officers, in the case of a graded district engrafted on a single ordinary one, to enlarge the domain if the trustees so desire by adding any outlying unorganized and unpeopled territory, however extensive, which may happen to be temporarily within the bounds of the organized township. Defendants contend for the authority and the complainants deny it. As it did not exist before the change of corporate character, but was denied during the primitive stage of the district, it

must have arisen, if it now exists, because the distinction between the former and present conditions has been supposed to point it out as necessary. It is not found in any express terms and, if present, it rests on implication. This is admitted.

The general law for organizing school-districts has always maintained certain distinct characteristics. The original arrangement of townships into districts, and the right to make alteration from time to time of such original districts has been confided without exception to the inspectors by the general law. At the same time, however, there has been no deviation from the rule that no primary district should contain more than nine sections. The attention of the Legislature has been repeatedly drawn to the subject, and the result has been uniform. The evidence of fixed policy is conclusive. Rev. St. 1838, p. 245, § 24; Rev. St. 1846, p. 227, § 71; Act 119 of 1873, p. 164; Act 230 of 1875, p. 281; Act 77 of 1877, pp. 60–61.

It became apparent to many at an early day that although a great deal in the total was being spent under our system of primary schools, there was yet in many cases no corresponding return of benefits, and the belief spread that the chief reason was that the means expended were too much scattered and that combination of expenditures and concentration of effort so far as fairly practicable would cause a great improvement. The Revised Statutes of 1846 recognized this phase of public sentiment, and made provision for the formation of union school-districts. The plan was not to construct new districts from aboriginal territory, but to provide for consolidating existing districts when deemed expedient. The new district was to be a *union district*, that is to say, one formed from two or more of the elementary districts. Rev. St. 1846, ch. 58, § 92.

Now as each original district might lawfully embrace any quantity of land not exceeding nine sections, and as the union district was to be formed by uniting two or more of such original districts, it is manifest that it might contain more than nine sections. Hence the method for constructing these districts was independent of the restriction limiting the area

to nine sections, and this was considered unobjectionable in the first setting up of a district where the change would consist in uniting territory and interests already under district organization and moreover where would be contemplated such a multiplication and distribution of school accommodations as would be just and reasonable for all parts of the territory.

No one could doubt however that changes might become needful at some time; but it was not regarded as wise to allow to inspectors the same power over the geographical extent of these districts that they held over that of primary districts. The provisions for establishing these districts were however interwoven with the general law, and it was understood that the inspectors' power under that law to alter districts was applicable to these. Impressed by these considerations the Legislature proceeded to qualify the power by requiring the assent of the district, as a preliminary, to any alteration of the bounds of a union district. This was effected by amendment of section 92, supra. Laws 1849, pp. 227, 228; Laws 1850, p. 20.

The next change to which it is necessary to refer was 1855. An elaborate act was then passed to enable school-districts to acquire school-house sites and for other purposes. A section was inserted providing that no alteration should be made in the boundaries of any school-district having a *union school* without the written consent of a majority of the district board of such district. Laws 1855, § 13, p. 42. Four years later " an act to establish graded and high schools " was passed. Laws 1859, p. 446. The last section declared the repeal of section 92 with the amendments of 1849 and 1850, supra. And the effect was to remove all the positive injunctions against altering the bounds of union districts except the injuction contained in section 13, supra, of the act of 1855. It also had the effect to efface from the general chapter concerning primary schools the provision for forming union districts. The great purpose of the act of 1859 was to provide for forming union districts through the concurring votes of the districts desiring union, and that certain single

districts on voting in favor thereof might transform themselves into graded and high-school districts.

So far the special provision against alteration of the bounds of districts had been confined specifically to union districts. But after this statute of 1859 permitting certain single districts to organize themselves into graded districts, and in 1871, the Legislature proceeded to amend section 13, supra, of the act of 1855. It was then ordered to read as follows:

"(2411.) Sec. 13. No alteration shall be made in the boundaries of any school-district organized under the law for *graded and high schools*, without the consent of a majority of the trustees of said district, which consent shall be spread upon the records of the district, and placed on file in the office of the clerk of the board of school inspectors of the township of which the reports of said district are made; and districts organized under the law aforesaid shall not be restricted to nine sections of land." Laws 1871, p. 277.

It is on this enactment that defendants rely. The district was converted from a single primary one to a graded district under the law mentioned in this amendment of 1871, and the proceeding to annex the outlying territory was taken on the strength of said amended provision.

When this statute is read in connection with the various other provisions of the school law, it appears to be wanting in precision and to be difficult of application in many cases to which the generality of the terms may be said to extend. It forbids any alteration in the boundaries of such districts as are organized under the law for graded and high schools except in so far as the trustees make known their consent to the inspectors. The restraint in terms applies to every kind of alteration, whether by increase or diminution of territory or by any change not affecting the quantity of territory. And there is no express mention of any right to add territory either from organized or unorganized tracts with or without the consent of the trustees. The statute applies to the districts as it finds them after their being framed into graded districts under the law therefor; and hence contemplates them under two classes, one comprising graded districts converted from single primary districts, and which on such conversion are

necessarily not more than nine sections in territorial extent, and the other consisting of districts formed by the union of two or more primary districts and which on such formation may contain more than nine sections.

Again, the terms of this act seem to imply an existing power in the inspectors to alter the bounds of these districts, and that such power is free from district control except as qualified by requiring corporate assent. And the final clause appears to convey the implication that the restriction to nine sections would apply unless expressly precluded. The peculiar structure of this statute no doubt lends a pretty strong support to the contention of defendants; but so exorbitant would be the results to which their construction would lead that it ought not to be adopted if any other more satisfactory on the whole can be found, and in my judgment the case is open to a different view, which is not only reasonable in itself, but exempt from the mischiefs, or at least the main ones, which appear incident to the position of the defendants.

The act of 1871, and section 71, supra, of the law, are *in pari materia*. Both provisions relate to the organization and arrangement of school-districts, and the former one indubitably refers to and is connected with the latter. The reason is extremely strong for concluding that it was the grant of power to inspectors in section 71 to change districts bounds that the Legislature had in mind in passing the provision of 1871 concerning the stability of boundaries, and no one will hesitate to admit that the clause exempting graded districts from the limitation to nine sections was intended as a virtual qualification of section 71; and this fact is sufficient to confirm the previous inference that the one provision about changing boundaries was made in reference to the other and to go along with it. These regulations must therefore be considered together, and the meaning of the act of 1871 must be judged of by comparing it with the others. *Joy v. Thompson* 1 Doug. (Mich.) 373; *United States v. Freeman* 3 How. 556; *Rex v. Loxdale* 1 Burrow 445.

Applying attention then to the 71st section of the General Law we immediately perceive that no power was then given

or contemplated to alter districts by additions from unorganized territory. The power to alter was confined to territory already cut up into districts, and was to be exercised among existing organizations, when the change would merely consist in withdrawing territory from the jurisdiction of one corporation and placing it under the jurisdiction of another. The only mode permitted for dealing with aboriginal territory was by dividing it into ordinary primary districts, and the same rule remains. The act of 1871 has not attempted to change it. In this and some other respects it is dependent on the other statute, and is explained and controlled by it. It was not the purpose of the Legislature in passing the statute of 1871 to enlarge the powers of school inspectors over aboriginal territory and give them a new and unprecedented authority to annex to a district at its request an unorganized region as large as some states.

It is unnecessary to go further. In my judgment the act by which complainants' lands were brought within the district was not warranted by law and the relief sought should have been given.

The decree must be reversed and one entered in accordance with the prayer of the bill.

The other Justices concurred.