## EX PARTE TOM FLAKE.

### No. 1165.   Decided October 11, 1911.

Rehearing denied June 26, 1912.

**1.—Cold Storage—Intoxicating Liquors—License—Tax—Police Power—Constitu-
tional Law.**

The Act of the Thirty-First Legislature, chapter 20, page 53, section 2,
making it an offense to unlawfully pursue the business of keeping, maintaining
and operating a cold storage where intoxicating liquors are kept on deposit, etc.,
in local option territory, without license and providing for an annual tax there-
for, etc., is not a measure to levy a tax for revenue, but is a police regulation and
is constitutional. Davidson, Presiding Judge, dissenting.

**2.—Same—Constitutional Law—Fourteenth Amendment.**

The Act of the Thirty-First Legislature, chapter 20, page 53, does not violate
and is not inimical to the fourteenth amendment of the Constitution of the
United States. Following Mugler v. Kansas, 123 U. S., 623. Davidson, Pre-
siding Judge, dissenting.

**3.—Same—Regulation of Intoxicating Liquors.**

The Constitution of Texas specifically provides the mode whereby it may be
determined whether or not the sale of intoxicating liquors shall be prohibited in
a given territory, and where the people elect to so decide, no power is taken from
the State to enforce it by this clause of the Constitution, but it is the duty of
the Legislature to enact all necessary laws to accomplish that end, which in-
cludes the cold storage law.

**4.—Same—One Subject—Constitutional Law.**

The Act of the Thirty-First Legislature, chapter 20, page 53, does not
violate section 35, article 3 of the Constitution of Texas in that it contains
more than one subject. Following Ex parte Walsh, 59 Texas Crim. Rep., 409.

**5.—Same—Right of Pursuing Occupation.**

The Act of the Thirty-First Legislature, chapter 20, page 53, does not violate
the Constitution of Texas, in that it deprives citizens of the State and all other
persons of the equal right of pursuing the occupation and business of cold
storage within a local option district. Davidson, Presiding Judge, dissenting.

**6.—Same—Excessive Fine—Unusual Penalties.**

The Act of the Thirty-First Legislature, chapter 20, page 53, does not
violate section 13 of article 1 of the Constitution of Texas in that it imposes
excessive fines and penalties and cruel and unusual punishment.

**7.—Same—Property Rights—Privileges and Immunities.**

The Act of the ·Thirty-First Legislature, chapter 20, page 53, does not violate section 19 of article 1 of the Constitution of Texas, in that it deprives citizens of Texas of their property rights, privileges and immunities of following such occupation and so exercising the rights of a free man, etc. Davidson, Presiding Judge, dissenting.

**8.—Same—Legislative Power—Police Regulation.**

If the Legislature deemed that cold storage, where intoxicating liquors are stored for others, without a license to do so, is inimical to the welfare of the citizens of the territory where prohibition has been adopted, it is within their province to enact such legislation. Davidson, Presiding Judge, dissenting.

**9.—Same—Prohibition Territory—Exclusive Right.**

The contention that the Act gives persons residing in the prohibition territory the exclusive right of conducting and pursuing the occupation of cold storage, etc., is not well founded.

**10.—Same—Equal and Uniform Taxation.**

The Act of the Thirty-First Legislature, chapter 20, page 53, does not violate sections 1 and 2 of article 8 of the Constitution of Texas, in that it is a tax and is not equal and uniform throughout the State and upon the same class of subjects within the limits of the authority levying the tax. Davidson, Presiding Judge, dissenting.

**11.—Same—Construction—Constitutional Law.**

In construing the Constitution, both the provision as to equal and uniform taxation as well as the making provision for the people of a county or subdivision thereof to prohibit the sale of intoxicating liquors, must be taken into consideration, and so construed as to effect the purpose and object of the framers of the Constitution, and when so construed there is no conflict in the laws thereunder, on these subjects. Davidson, Presiding Judge, dissenting.

**12.—Same—Local Legislation.**

The Act of the Thirty-First Legislature, chapter 20, page 53, is neither a local nor a special law, and does not violate sections 56 and 57 of article 3 of the Constitution of Texas. Following Jollif, 53 Texas Crim. Rep., 65, and other cases.

**13.—Same—Bill of Rights—Declaration of Independence.**

The Act of the Thirty-First Legislature, chapter 20, page 53, does not violate the fundamental principles of our free institutions as expressed in the Declaration of Independence, the Constitution of the United States, the Bill of Rights and the Constitution of the State of Texas, because it relates only to those places where intoxicating liquors are stored in prohibition territory, and does not regulate nor prohibit cold storage in general. Davidson, Presiding Judge, dissenting.

**14.—Same—Nonintoxicating Liquors—Fermented and Distilled Liquors.**

It would do violence to the rules of construction, to construe the words "nonintoxicating liquors" as used in the Act of the Thirty-First Legislature, chapter 20, page 53 to mean any liquid or fluid such as water, milk, etc., but they must be construed to mean fermented or distilled spirituous fluids containing some quantity of alcohol, and that this character of Legislation has but one purpose which is to secure the enforcement of the local option law and detect violations of the law when intoxicating liquors are in fact sold. Davidson, Presiding Judge, dissenting.

**15.—Same—What Constitutes Police Power—Self-Protection First Law.**

The State, like an individual, is authorized to protect itself against those things which threaten its existence, and its existence can not be maintained except by the protection of the life, health and happiness of its citizens, their moral and physical welfare, and the promotion of what will upbuild its educational and industrial interests.

**16.—Same—Nonintoxicating Malt Liquors—Alcohol.**

The legal and fixed meaning of nonintoxicating malt liquors is a liquor containing some percent of alcohol, and it is this ingredient of alcohol that gives the State the right of regulation and control under its police power, and this is the meaning of the words as used in said Act. Following Ex parte Townsend, 64 Texas Crim. Rep., 313. Davidson, Presiding Judge, dissenting.

**17.—Same—Case Stated—Nonintoxicant Not Involved.**

Where the indictment charged the storing of intoxicating liquors in local option territory, and it was not alleged or contended that the liquor stored by relator was other than intoxicating liquors, he is not in a position to complain or raise the question as to what other liquors the statute does or does not apply. Davidson, Presiding Judge, dissenting.

**18.—Same—Tax—Police Power—Blending of Powers.**

The police power of the State is frequently exercised by the levy of occupation taxes; sometimes incidentally revenue may be raised thereby, and sometimes they are prohibited.

**19.—Same—Prohibition Territory—Nonprohibition Territory.**

The Act of the Thirty-First Legislature, chapter 20, page 53, is not unconstitutional because the same applies alone to territory where prohibition has been adopted, as by the Constitution different laws and different remedies may be adopted in territory where the sale of liquor is permitted than those in such territory where it is prohibited. Davidson, Presiding Judge, dissenting.

From Johnson County.

Original habeas corpus proceeding asking relief from arrest on an indictment charging the defendant with unlawfully pursuing the business of keeping, maintaining and operating a cold storage where intoxicating liquors were kept, etc., in local option territory.

The opinion states the case.

*Odell & Johnson* and *S. C. Padelford,* for appellant.—Cited cases in minority opinion.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, Judge.—Relator was indicted by the grand jury of Johnson County, charged with the offense of unlawfully pursuing the business of keeping, maintaining and operating what is commonly known as a cold storage, where intoxicating liquors were kept on deposit for others, in a county in which the sale of intoxicating liquors had been prohibited. Upon being arrested, he sued out a writ of habeas corpus, in his application contending that the law under which he was indicted was unconstitutional and void on the several grounds alleged in his application, each of which we will discuss hereafter.

The Act in question reads as follows: "In all counties, justice precincts, towns, cities or other subdivisions of a county where the qualified voters thereof have by a majority vote determined that the sale of intoxicating liquors shall be prohibited therein, there is hereby levied upon all firms, persons, association of persons and corporations that pursue the business of keeping, maintaining or operating what is commonly known as a 'cold storage' or any place by whatever name

known or whether named or not, where intoxicating or nonintoxicating liquors or beverages are kept on deposit for others, or where any such liquors are kept for others under any kind or character of bailment, an annual State tax of two thousand ($2,000) dollars. Counties, incorporated cities and towns, where such business is located, may each levy an annual tax of not exceeding one thousand ($1,000) dollars upon each such place so kept, run, maintained or operated." (Section 2, Act of Thirty-First Legislature, chapter 20, page 53.)

Section 3 of said acts provides for the application to be filed with the county clerk, and the conditions upon which he will issue a license.

Relator contends this is a tax for revenue, and not a police regulation. When we take into consideration the history of such laws and regulations, the purpose and the intention of the Legislature in enacting them, and the entire Act, of which this section is a portion, together with other laws and regulations passed at that session of the Legislature, we do not think the contention can be maintained. It is a matter of current history, known of all men, that such places had been established in that portion of our State where the sale of intoxicating liquors had been prohibited, and in many instances had been used as a blind or cover whereby the illegal sale of intoxicants might be indulged in by the keeper and manager. When we take these things into consideration, the amount of license fee or tax, and, as said by relator, which is beyond the amount that could reasonably be expected to be realized annually in pursuing the business, no person, we think, can seriously contend that the Legislature intended this as a revenue measure, but that it is one of the regulations passed in aid of the enforcement of the local prohibitory law, and to remove one of the evils that had proven a serious impediment to the enforcement of the local option law wherever adopted. We hold that it is not an exercise of the taxing power, but a police regulation, and in discussing the different grounds in relator's application we will treat the law as a police regulation and not a tax for revenue purposes.

In the first ground relator contends the law is unconstitutional and violates and is inimical to the fourteenth amendment of the Constitution of the United States. In Mugler v. Kansas, 123 U. S., 623, the Supreme Court of the United States says, in holding it the right of the State to pass police regulations:

"This conclusion is unavoidable, unless the fourteenth amendment of the Constitution takes from the States of the Union those powers of police that were reserved at the time the original Constitution was adopted. But this court has declared, upon full consideration, in Barbier v. Connolly, 113 U. S. 31, that the fourteenth amendment had no such effect." In this case it is said: "But neither the amendment— broad and comprehensive as it is—nor any other amendment was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education and good order of the people."

That the regulation of intoxicating liquors is within this power has been affirmed by all the courts. In what is termed the License Cases (46 U. S., 5 How. 504), the United States Supreme Court says: "The police power extends not only to things intrinsically dangerous to the public health, such as infected rags and diseased meats, but to things which, when used in a lawful manner, are subjects of property and commerce, and yet may be used so as to be injurious or dangerous to the life, the health, or the morals of the people. Gun powder, for instance, is a subject of commerce, and of lawful use, yet because of its explosive and dangerous quality, all admit the State may regulate its keeping and sale. And there is no article which the right of a State to control or prohibit the manufacture of within its limits is better established than intoxicating liquors. This power is inherent in a sovereign State, and may be exercised unless the Constitution of the State inhibits it in so doing." Our Constitution specifically provides a mode whereby it may be determined whether or not the sale of intoxicating liquors shall be prohibited in a given territory, and where the people elect to so decide, by this clause of the Constitution no power is taken from the State to enforce it, but we deem it the duty of the Legislature to enact all necessary laws to accomplish that end.

The second contention is that the Act is inimical to and violates section 35, article 3 of the Constitution of this State, in that it contains more than one subject. We do not think this contention is well founded, for if we view it as a police regulation, it embraces but one subject, object and purpose—the regulation and prohibition of the liquor traffic in territory where it has been prohibited. For a discussion of this question see Ex parte Walsh, 59 Texas Crim. Rep., 409, 129 S. W. Rep., 118, and authorities cited.

It is also contended that the Act is violative of our Constitution in that it deprives the citizens of the State of Texas and all other persons, of the equal right of pursuing the occupation and business of cold storage within the local option districts. The law bears equally on all citizens who seek to do the character of business defined in the Act—makes no exceptions. The same restrictions are placed around each applicant, and any citizen meeting the requirements can obtain a license to pursue the business.

The contention is made that the Act is in violation of section 13, article 1 of the Constitution in that it imposes excessive fines and penalties and cruel and unusual punishment. The courts of this State have sustained the law making it a felony to sell a single drink of intoxicating liquor in the prohibited territory, and this, in making the failure to pay the fee required to obtain a license a misdemeanor, assessing a fine in double the amount of that sum as the penalty for its violation is the usual penalty prescribed for failure to pay the fees assessed under our occupation tax and license laws.

The next contention is, it is violative of and inimical to section 19, article 1 of the Constitution, in that "it deprives citizens of Texas

of their property rights, privileges and immunity of following such occupations and so exercising the rights of a free man, and deprives the citizens of this State of said property rights, privileges and immunities, the license fee being so large as to be prohibitive of the business. In Mugler v. Kansas, 123 U. S. 623, the Supreme Court of the United States declares the law to be:

"It is, however, contended, that, although the State may prohibit the manufacture of intoxicating liquors for sale or barter within her limits, for general use as a beverage, 'no convention or Legislature has the right, under our form of government, to prohibit any citizen from manufacturing for his own use, or for export, or storage, any article of food or drink not endangering or affecting the rights of others.' The argument made in support of the first branch of this proposition, briefly stated, is that in the implied compact between the State and the citizen certain rights are reserved by the latter, which are guaranteed by the constitutional provision protecting persons against being deprived of life, liberty or property, without due process of law, and with which the State can not interfere; that among those rights in that of manufacturing for one's use either food or drink; and that while, according to the doctrines of the Commune, the State may control the tastes, appetites, habits, dress, food and drink of the people, our system of government, based upon the individuality and intelligence of the citizen, does not claim to control him, except as to his conduct to others, leaving him the sole judge as to all that only affects himself.

"It will be observed that the proposition, and the argument made in support of it, equally concede that the right to manufacture drink for one's personal use is subject to the condition that such manufacture does not endanger or affect the rights of others. If such manufacture does prejudicially affect the rights and interests of the community, it follows, from the very premises stated, that society has the power to protect itself, by legislation, against the injurious consequences of that business. As was said in Munn v. Illinois, 94 U. S., 124 (24:83), while power does not exist with the whole people to control rights that are purely and exclusively private, government may require 'each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another.'

"But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions, so as to bind all, must exist somewhere; else society will be at the mercy of the few, who, regarding only their own appetite or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the State, and to

determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety.

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the State. There are, of necessity, limits beyond which legislation can not rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute, Sinking Fund Cases, 99 U. S. 718 (25:501), the courts must obey the Constitution rather than the lawmaking department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. 'To what purpose,' it was said in Marbury v. Madison, 5 U. S. (1 Cranch.) 137, 167 (2:60, 70), 'are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.' The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the Legislature has transacted the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

"Keeping in view these principles, as governing the relations of the judicial and legislative departments of government with each other, it is difficult to perceive any ground for the judiciary to declare that the prohibition by Kansas of the manufacture or sale, within her limits, of intoxicating liquors for general use there as a beverage, is not fairly adapted to the end of protecting the community against the evils which confessedly result from the excessive use of ardent spirits. There is no justification for holding that the State, under the guise merely of police regulations, is here aiming to deprive the citizen of his constitutional rights; for we can not shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety, may be endangered by the general use of intoxicating drinks; nor the fact, established by statistics accessible to everyone, that the idleness, disorder, pauperism, and crime existing in the country are, in some degree at least, traceable to this evil. If, therefore, a State deems the absolute prohibition of the manufacture and sale, within her limits, of intoxicating liquors for other than medical, scientific, and manufacturing purposes, to be necessary to the peace and security of society, the courts can not, without usurping legislative functions, override the will of the people as thus expressed by their

chosen representatives. They have nothing to do with the mere policy of legislation. Indeed, it is a fundamental principle in our institutions, indispensable to the preservation of public liberty, that one of the separate departments of government shall not usurp powers committed by the Constitution to another department. And so, if, in the judgment of the Legislature, the manufacture of intoxicating liquors for the maker's own use, as a beverage, would tend to cripple, if it did not defeat, the effort to guard the community against the evils attending the excessive use of such liquors, it is not for the courts, upon their views as to what is best and safest for the community, to disregard the legislative determination of that question. So far from such a regulation having no relation to the general end sought to be accomplished, the entire scheme of prohibition, as embodied in the Constitution and laws of Kansas, might fail, if the right of each citizen to manufacture intoxicating liquors for his own use as a beverage were recognized. Such a right does not inhere in citizenship. Nor can it be said that government interferes with or impairs anyone's constitutional rights of liberty or of property, when it determines that the manufacture and sale of intoxicating drinks, for general or individual use, as a beverage, are, or may become, hurtful to society, and constitute, therefore, a business in which no one may lawfully engage. Those rights are best secured, in our government, by the observance, upon the part of all, of such regulations as are established by competent authority to promote the common good. No one may rightfully do that which the lawmaking power, upon reasonable grounds, declares to be prejudicial to the general welfare.

"This conclusion is unavoidable, unless the fourteenth Amendment of the Constitution takes from the States of the Union those powers of police that were reserved at the time the original Constitution was adopted. But this court has declared, upon full consideration, in Barbier v. Connolly, 113 U. S., 31 (28:924) that the fourteenth amendment had no such effect. After observing, among other things, that that amendment forbade the arbitrary deprivation of life or liberty, and the arbitrary spoliation of property, and secured equal protection to all under like circumstances, in respect as well to their personal and civil rights as to their acquisition and enjoyment of property, the court said: 'But neither the amendment—broad and comprehensive as it is—nor any other amendment was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity.'"

If the Legislature deemed that "cold storage," where intoxicating liquors are stored for others, without a license to do so, is inimical to the welfare of the citizens of the county where prohibition had been adopted, it is not for this court to declare there was no foundation

for such conclusion, and, if they so adjudged, they may have had as much reason to pass this law as to prohibit one from permitting his house to be used as a gambling house, or to prohibit one from running a gaming house, in the interest of public morals. Persons are prohibited in this State from devoting their time, talent, and energies to or pursuing a number of vocations, and are also prohibited from using their houses and property for such purposes, and if the Legislature deems it necessary to prohibit "cold storages" for storage of intoxicating liquors, or require a license to be obtained by all who engage in the business, that it may be known who are so engaged and to control the same, in the interest of the public good and the public morals, and to render more effective the local option law wherever adopted, it is within their province.

The contention of relator that the "Act" gives persons residing in the prohibition territory the exclusive right of conducting and pursuing the occupation of "cold storage," etc., is not well founded. No such construction can be given the law from any standpoint you might view it.

Paragraphs seven and eight complain that the law is inimical to and violative of sections 1 and 2 of article 8 of the Constitution, in that it is a tax and is not equal and uniform throughout the State, and that it is not equal and uniform upon the same class of subjects within the limits of the authority levying the tax. If we should view this Act as a tax levied for revenue, and give to its provisions the construction able counsel for relator contend (the construction of which will hereinafter be discussed) this contention might be well founded. The law, it is true, as contended by relator, applies only to territory where local option has been adopted, but does that make the law unequal? In the law levying a license fee on dealers in intoxicating liquors in territory where local option has not been adopted, we find the following provision: "Section 1. Hereafter there shall be collected from every person, firm, or association of persons, selling spirituous, vinous or malt liquors, or medicated bitters capable of producing intoxication, in this State, *not located in any county or subdivision of a county, justice precinct, city or town where local option is in force under the laws of Texas, an annual tax,*" etc. This law levies a license fee alone in territory where prohibition is not in force, and if the law applicable alone to prohibition territory is unconstitutional for that reason, then our whole license fails, because the Legislature in about all of its enactments has drawn a clear and distinct line and adopted different license fees and regulations in territory where the sale of intoxicating liquors are permitted, and in the territory where it is prohibited. We do not think the Legislature violates the spirit of any of the provisions of our Constitution in so providing, but is carrying out the plain mandates of the Constitution. When the people of this State met in 1876 to form the organic law which governs us, and which is the supreme law of the land, they, in the different provisions of article

8, recognizing that taxation was a necessity to support the State government, provided that the burden of taxation, when levied, must bear equally upon all—there should be no favoritism and no exemptions, except such as they in said article provided. But in that Constitution, in article 15, section 20, it was also provided that the people of a county or certain subdivision thereof should have the right to prohibit the sale of intoxicating liquors. In construing the Constitution both of these provisions must be taken into consideration, and be so construed as to effect the purpose and object of the framers of that instrument. They are bound to have recognized that laws passed assessing license fees and for the regulation and control of intoxicating liquors in territory where the sale was permitted could not and would not operate in territory where the sale was prohibited; and likewise that laws passed to render effective the provisions of article 16, section 2, could not and would not operate in territory where the sale was permitted. There is no conflict in the laws, nor do they become unconstitutional by reason of the fact that the Legislature, recognizing all the provisions of the Constitution, limit the effect of the laws in accordance with the spirit and intent of the people of this State as expressed in the Constitution. This has been recognized by this court in upholding the laws in those cases wherein the license fee for selling intoxicating liquors in territory where the sale is permitted in one amount, and sustaining a law for a less amount in the territory where the sale is prohibited, except upon the prescription of a physician. These laws partake to a great extent of the exercise of the police power by the State, and are not violative of the provisions of the Constitution which provide for the levy and collection of taxes for revenue purposes.

Neither is this Act violative of sections 56 and 57, of article 3 of the Constitution. It is neither a local nor special law, as has been frequently declared by this court. Joliff v. State, 53 Texas Crim. Rep., 65; Logan v. State, 54 Texas Crim. Rep., 74; Smith v. State, 54 Texas Crim. Rep., 302; Wallis v. Williams, 101 Texas, 397; Ex parte Dupree, 105 S. W. Rep., 495; Green v. State, 92 S. W. Rep., 847; Edmanson v. State, decided at the present term of the court and authorities cited.

Appellant in conclusion assigns that the Act is violative of the fundamental principles of our free institutions as expressed in the Declaration of Independence, in the Constitution of the United States, and in the Bill of Rights, and in the Constitution of the State of Texas. If the words in the Act are to be given the broad, comprehensive meaning that counsel for relator in their brief give to them, the Act, of course, would be unconstitutional. An able argument is made defining the powers of government, and in the main we agree with all that is said in regard thereto, but we do not agree with counsel that the Act relates to or embraces the many agencies or articles of merchandise by

Vol. LXVII Crim.—15.

them referred to. The premise upon which the argument is based, being wrong, the principles presented with such distinguished ability are not applicable to this case. With deductions and conclusions of fact reached by relator's counsel, we do not agree, and think they are not justified by the law in question, and while in the abstract agreeing with all that is said about the history of our country, the growth and principles underlying the law, and that the Constitution is and must always be held supreme, yet all their argument is based upon a wrong construction of the Act in question as we see it. It does not prohibit or regulate "cold storage" in general. It relates only to those places where intoxicating liquors are stored in prohibition territory. If one does not follow the occupation or business of storing named in the Act for others, the law applies not. Any and all other commodities and merchandise may be stored and kept for others, and the many articles of commerce named in relator's brief do not come within the meaning of the law. What is meant by the words "intoxicating liquors" there is no room for construction, for these words have a well understood legal meaning, and we do not think relator seriously contends that if the Act contained these words alone, that the citation of authorities or argument contained in the brief would apply, if this law is to be construed as a police regulation and not an exercise of the taxing power for revenue purposes.

But relator gives to the words "nonintoxicating liquors or beverages" a meaning we think was never contemplated by the Legislature. Again, we would say, if the construction placed on these words by counsel for relator is correct, then the reasoning in the brief would be sound, and the authorities cited apply. However, we think no rule of law would permit or authorize such construction to be placed on these words, or the terms of the Act in question. We must consider the language used in connection with the evil intended to be corrected, if evil there be, and in this connection we should take into consideration current history as it relates to the question to which the legislation relates. As said by Chief Justice Taney, 44 U. S., 9 (11 Law. Ed. 469) in the case of Aldridge v. Williams: "The law as it passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the Act itself; and we must gather their intention from the language there used, comparing it, when any ambiguity exists, *with the laws upon the same subject, and looking, if necessary, to the public history of the times in which it is passed.*" See also 91 U. S., 79; 148 U. S., 494; 66 N. H., 660; 21 Fed., 376; 79 Fed., 320; 122 Ind., 479; 61 Minn., 439. In this State this has always been the rule of construction. In Croomes v. State, 40 Texas Crim. Rep., 672, it is held:

" 'Every statute is to be construed with reference to its intended scope and the purpose of the Legislature in enacting it; and where the language used is ambiguous, or admits of more than one meaning, it is to be taken in such a sense as will conform to the scope of the Act

and carry out the purpose of the statute.' And Mr. Endlich, in his work on the Interpretation of Statutes (page 33) says: 'But it is another elementary rule that a thing which is within a letter of the statute is not within the statute unless it be also within the meaning of the Legislature; and the words, if sufficiently flexible, must be construed in the sense which, if less correct grammatically, is more in harmony with that meaning. Language is rarely so free from ambiguity as to be incapable of being used in more than one sense, and to adhère rigidly to its literal and primary meaning in all cases would be to miss its real meaning in many. If a literal meaning had been given to the laws which forbade a layman to lay hands on a priest, and punish all who drew blood in the street, the layman who wounded a priest with a weapon would not have fallen within the prohibition, and the surgeon who bled a person in the street to save his life would have been liable to punishment.' Mr. Sutherland says: 'Words and clauses in different parts of a statute must be read in a sense which harmonizes with the subject matter and general purpose of the statute. No clearer statement has been or can be made of the law as to the dominating influence of the intention of a statute in the construction in all its parts than that which is found in Kent's Commentaries: 'In the exposition of a statute the intention of the lawmaker will prevail over the literal sense of the terms, and its reason and intention will prevail over the strict letter. When the words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant with reason and good discretion.' "

Our Supreme Court has also adopted this rule of construction. In Higgins v. Rinker, 47 Texas, 401, Chief Justice Roberts holds: "In the construction of a statute, every part of it must be viewed with the whole, so as to make all parts harmonize, if practicable, and give a sensible effect to each. The presumption must always be in favor of the validity of the laws, unless the contrary is clearly demonstrated. It is the duty of courts to construe statutes to meet the mischief, and to advance the remedy, and not to violate fundamental principles. . . . It is competent for the court in interpreting the meaning and . object of laws, to find out and take into consideration the existing facts to which the law is intended to be applied, whether they consist of the ordinary acts of persons, or of the habits of business relating to the subject matter embraced within the law. That which is implied in a statute is as much a part of it as what is expressed," citing authorities. See also 93 Texas, 444; 15 Texas, 321.

Again in Vance v. Newcombe, 132 U. S., 220, the Supreme Court of the United States says: "It is a rule of interpretation that in cases of doubt or uncertainty, Acts in pari materia, passed either before or after, may be referred to in order to discern the intent of the Legislature in the use of particular terms, or in the enactment of

particular provisions, and within the reason of the rule, contemporaneous legislation, not precisely in pari materia, may be referred to for the same purpose."

And in United States v. Freeman, 3d How., 562, the Supreme Court of the United States holds: "The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them, and it is an established principle of law, that all Acts in pari materia are to be taken together, as if they were one law." See also 113 U. S., 560; 45 Ala., 443; 51 Ala., 54; 15 Ga., 441; 145 Ind., 460; 83 Me., 257; 45 Mich., 564; 126 Mo., 720; 54 Fed. 154.

In our State this has been the rule from the earliest date. In Walker v. State, 7 Texas Crim. App., 259, it is held: "Statutes in pari materia and relating to the same subject are to be taken and construed together, because it is to be inferred that they had one object in view, and were intended to be considered as constituting one entire and harmonious system. See also Cain v. State, 20 Texas, 362; Ex parte Schmidt, 2 Texas Crim. App., 202; Mock v. State, 11 Texas Crim. App., 58; Taylor v. State, 3 Texas Crim. App., 198.

In our Supreme Court the rule is: "Laws relating to same subject and enacted during same session are construed together (Austin v. Gulf, etc., 45 Texas, 266). All statutes relating to the same subject matter should best be given concurrent efficacy in construction, and made to stand together. (Dallam, 402.) In order to arrive at intention of Legislature in statute, all laws in pari materia are to be construed together. (75 Texas, 252.) Two statutes, in pari materia, passed at the same session must be considered as one and be construed together. (24 Texas, 257; 28 Texas, 727; 59 Texas, 183; 71 Texas, 218, and other cases cited in these opinions.)

Again it is held to be a rule of construction that when a law is susceptible of either of one or two constructions, the one which is constitutional will be adopted. (Nobles v. State, 38 Texas Crim. Rep., 332; Johnson v. Hanscomb, 90 Texas, 327; 47 Texas, 435; 73 Texas, 374; 89 Texas, 167.)

The Supreme Court of the United States also declared: "Where the language of an Act will bear two constructions, equally obvious, that one which is clearly in accordance with the provisions of the Constitution is to be preferred." 187 U. S., 197. "The elementary rule is that every reasonable construction must be resorted to in order to save a statute from unconstitutionality." Hooper v. California, 135 U. S., 648.

With these rules of construction in view, we will now consider the Act, and give to the words used therein what we think is the proper construction. "The business of keeping, maintaining or operating what is commonly known as a 'cold storage' or any place by whatever name known, or whether named or not, where intoxicating or nonintoxicating liquors or beverages are kept on deposit for others."

The words "nonintoxicating liquors" relator seeks to give a meaning and construction to which would render the Act invalid under the Constitution. Webster in his Unabridged Dictionary gives the word "liquor" two definitions: First—Any liquid or fluid substance as water, milk, blood, sap, juice, and the like; second—especially alcohol or spirituous fluid either distilled or fermented. Relator insists that the first definition is the one that should be given to the word as used in the statute and not fermented or distilled spirituous fluid. This would do violence to the intention of the Legislature. It, as we conceive, had no idea of applying the law to such fluids as water, milk, and the like, but it was the second definition it had in view. And in this view we are strengthened when we take into consideration the contemporaneous acts of the Legislature. By reference to the "House Journal" we find the above bill numbered 69, and was introduced by Mr. Cable. On the same day, and at the same time as near as possible, we find that Mr. Cable also introduced House Bill No. 68, levying a license fee of $2,000 on all persons, firms, association of persons, and corporations selling *nonintoxicating malt liquors,* and requiring the persons engaging in such business to procure a license from the county clerk. Sections 2, 3, 4 and 5 of this Act are identical in terms with sections 3, 4, 5 and 6 of the Act now being construed. (See pages 51 and 53 of the Acts of Thirty-First Legislature, chapters 19 and 20.) Section 1 of this Act requires a license for those taking orders for intoxicating liquors, while section 2 is the one under which relator is being prosecuted. Both bills were introduced by the same author, on the same day (House Journal, pp. 63-64) were reported favorably by the committee on the same day (H. J. 224) were passed by the House on the same day (H. J. 252, 254, 253 and 255). Both were passed by the Senate on the same day (Senate Journal, 413 to 419). They were both approved by the Governor on the same day, and became a law on the same day. So we would do violence to all known rules of construction if they were not considered together, for they both have the same object and purpose—being passed in aid of the enforcement of local option law wherever adopted. As said by our courts, they relate to the same matter, and having the same object and purpose, must be construed together, and when we do so no other meaning can be given to the words "nonintoxicating liquors or beverages" in the latter Act than nonintoxicating malt liquor (a fermented liquor) for which a license fee is required in the first Act herein cited. And when we take into consideration current history, as is authorized by the opinions here recited, we know that men have gone into territory where prohibition has been adopted, selling and pretending to sell malt liquors called "frosty," "uno," "ino," tin top, etc., all of which are fermented malt liquors, which were claimed to be nonintoxicating malt liquors, and under the guise of selling these liquors, would engage in selling intoxicating liquors. Bottles of liquor were thrown in tubs of ice water, with these labels floating about, and it was found

difficult, yea, almost impossible, to detect violations of the local option laws when intoxicating liquors were in fact sold. The control and regulation of this character of business was the intent, object and purpose of the Legislature in enacting the law requiring a license to be obtained and a large tax or fee paid; also providing that in the event anyone should attempt to engage in such business without first obtaining a license he might be enjoined from so doing, and in the event one did obtain license, his place of business would be known, and if under the license, attempt to or sell intoxicating liquors, a writ of injunction might be obtained enjoining him from so doing, thus furnishing a speedy and effective remedy for the enforcement of local option wherever adopted. The whole system or scheme of legislation has but one purpose, and the Legislature had no other intention, and that is to secure an enforcement of the people's will as expressed at the ballot box in the adoption of the local prohibitory law, and as under a proper construction of the language, nothing is within the provisions of its terms as would impair one's liberty or property rights except in so far as one might seek to engage in a character of business that the citizens in the exercise of their rights under our State Constitution, have declared to be inimical to the health and happiness of the community, hurtful to the public morals, and destructive of the public peace, we do not think the Act violative of any provision of our State Constitution, or of the provisions of the Constitution of the United States.

It is true, perhaps, that many have engaged in selling and storing these nonintoxicating malt liquors in good faith, and never sold or stored for others anything intoxicating in its nature, yet if there be those, and as a matter of judicial history we know there has been those who, under the pretense of engaging in this character of business, have but used it as a shield and cover to engage in the sale of intoxicants, and the Legislature finding that such illicit and improper dealings had grown to such magnitude, concluded that for the best interest of the citizens of the State that it be controlled and regulated, it is not within the province of the court to say to them nay. Of the wisdom or policy in adopting the local option law, or the Legislature in adopting these regulatory measures in aid of its enforcement, if adopted, it is not our purpose or province to speak. The citizenship within the territory authorized by the Constitution and laws must decide for themselves the wisdom of the adoption of the law, and the legislative branch of the government, when the law has been adopted prohibiting the sale of intoxicants, the wisdom and necessity of laws to secure its enforcement. In this opinion we are speaking only of the restrictions placed on the Legislature by the Constitution of this State and of the United States, and as this Act, and the other Acts passed at the session of the Thirty-First Legislature, in aid of the enforcement of this law when adopted, when construed in accordance with the legislative intent, gathered from the Acts themselves,

and the judicial and public history of the times, and the well known rules of construction, that when two constructions are possible and permissible, it is the duty of the courts to give to any and all laws that construction which will maintain their constitutionality, we find nothing repugnant in this Act to the Constitutions of the United States or of this State.

Relator is remanded.

Davidson, Presiding Judge, absent.

ON REHEARING.

June 26, 1912.

HARPER, JUDGE.—This case was affirmed at a former day of this term, and relator's counsel filed a motion for rehearing in which he earnestly insists that this court erred in several respects in the original opinion. The opinion in the case is already so lengthy we would not write further only that counsel so earnestly insist that we are wrong in holding that the statute in question is but an exercise of the police power inherent in the State. Many learned men and text-writers have written definitions stating of what the police power consists, but the one that appeals most directly to us is the one that tersely stated it was akin to the right of self-defense in an individual. As a man is authorized to protect himself against danger threatening life or limb, so is the State authorized to protect itself against those things which threatens its existence, and its existence can not be maintained except by the protection of the life, health and happiness of its citizens, their moral and physical welfare; and the promotion of what will upbuild its educational and industrial interests. If this law was seeking to deal with an object of commerce that was harmless, and could and would not injuriously affect the best interests of society, then the right of the State to levy in effect a prohibitory tax would be questionable, and the authorities cited by relator apply. But in this case it can not be contended that a "harmless beverage" was being dealt with, intoxicating and "nonintoxicating malt liquors."

In the case of Ex parte Townsend, 64 Texas Crim. Rep., 313, 144 S. W. Rep., 629, we discussed at length the meaning of malt liquors, and demonstrated that the legal and fixed meaning of "nonintoxicating malt liquors" was a liquor containing some percent of alcohol, and it was this ingredient—alcohol—that gave to the State the right of regulation and control under the police power. That other liquors than liquors containing alcohol, might, under some constructions, be brought within the definition and meaning of the words there used, that would not render the law unconstitutional, but as said by all the authorities, it is the duty of this court to give the words the definition and meaning which would uphold the constitutionality of the Act. This we have done, as it was our duty to do, and those storing liquors with no percent of alcohol therein are not brought within the provisions of the

statute, and have no cause for complaint, and that it has been held to apply to all persons storing liquors for others, which liquors contain any percent of alcohol, is but giving force to the legislative intent and will, and whether or not we approve the policy of the law, "alcohol" in any and all its forms has been held by all the authorities subject to the police power of a State, and may be regulated, controlled or prohibited, if not inhibited by some provision of the Constitution.   This power is illustrated in the prohibition of the sale of cocaine, morphine, laudanum, opium in all its forms, and other deleterious and harmful drugs and drinks, and the same rule of law that applies to them applies to "alcohol" in all its forms.   In Kentucky a law was passed levying a tax on "soft drinks," and it was contended that this term included lemonade, soda water, mineral water and other harmless beverages as is contended in this case.   In the case of Bradford v. Jones, 135 S. W. Rep., 291, it was held: "The term 'soft drinks' while including lemonade, soda water, mineral waters, and other innocent and harmless beverages, they are generally used in reference to 'malt mead,' 'near beer,' and other alcoholic decoctions, invented to take the place of intoxicating drinks.   'Soft drinks' that contain any percent of alcohol are regarded as hurtful to the morals and health of the community, and their sale might well come within the control and regulation of the police power. . . .   It might be arbitrary and oppressive to fix the license fee for selling useful and pure mineral or health-giving waters at a sum that would virtually prohibit their sale, when it would not be arbitrary or oppressive to fix a license fee at a prohibitive figure for the sale of beverages that are not wholesome. . . .   If appellant was only engaged in the sale of lemonade or like useful and innocent beverages, he should have so stated in his petition, and then we could deal with the precise case.

"In Wells v. Town of Mt. Olivet, 126 Ky., 131, 102 S. W., 1182, 31 Ky. Law Rep., 576, 11 L. R. A. (N. S.) 1080, we said: 'When an ordinance is assailed upon the ground that it is illegal, unfair, unreasonable, or oppressive, the person complaining will ordinarily be required to point out specifically in what respects the ordinance is unreasonable, unequal, or oppressive, as applied to the facts of the case relied on by him.   An ordinance general in its scope may be adjudged reasonable as applied to one state of facts, and unreasonable when applied to circumstances of a different character.   In recognition of these general rules, it is necessary that the plaintiff shall make out a clear case to authorize the court to interfere with the police powers of a municipal corporation when exercised in the enactment of ordinances. . . .   When the aid of the court is invoked to declare a municipal ordinance void, it must clearly appear that it is inherently violative of the law or some of the well settled principles that are generally recognized as limitations upon the power of municipalities in the enactment of ordinances, or, if the ordinance is not inherently defective as coming within these inhibitions, then the person attacking it must

affirmatively show that as applied to him it is unreasonable, unfair or oppressive.'

"When the police power can be invoked as authority for a municipal corporation to control and regulate the sale of an article, it may, if not forbidden by the statute, carry the right of control and regulation to such an extent as to prohibit the sale of it. Town of Pikeville v. Huffman, 112 Ky., 360, 65 S. W., 794, 23 Ky. Law Rep., 1692; Commonwealth v. Payne Medicine Co., 138 Ky., 164, 127 S. W. 760."

In this case the indictment charges the storing of intoxicating liquors, and it is not alleged nor contended that the °liquors stored by relator are other than intoxicating liquors, and under the decisions above cited, he is not in position to complain or raise the question as to what other liquors the statute does or does not apply. And in the case of Pikeville v. Huffman, 65 S. W. 794, a law levying a license or tax on the sale of cider is upheld, on the ground that it contained alcohol, the court saying: "It is generally conceded now that it is a° proper exercise of the police power, inherently incidental to government, to regulate by license or otherwise, or even to prohibit those callings hurtful to the morals, the health, or the peace of society. Embraced in such is the making, vending and use of intoxicants." As to the amount of alcohol contained within a beverage, it is held to be immaterial, but if contained in any percent it is hurtful and harmful to the health, peace and morals, and it is not the extent of its hurtful capacity that controls.

In the case of Caswell v. State, recently decided by our Court of Civil Appeals (not yet reported) it was held that if "the sale of pistols has a tendency to be hurtful to the welfare of society, then in that event the lawmaking power would have the right not only to levy an occupation tax, which would be prohibitive thereof, but could go further and absolutely prohibit anyone from engaging therein." Many other authorities might be cited, but we merely refer to the cases of Edmandson v. State, and Ex parte Townsend, recently recided by this court, and Caswell v. State and Smith v. State, recently decided by the Court of Civil Appeals, where other citations will be found.

But relator contends that if the State under its police power had the right to regulate and prohibit under the police power, yet this is an occupation tax and not an exercise of the police power. Relator overlooks the fact that nearly all our license laws are an entwining of the police power to tax. That the police power is frequently exercised by the levy of occupation taxes, sometimes incidentally revenue may be raised thereby and sometimes they are prohibitive. No one could justify the high license, or occupation tax, levied on the sale of liquors, where not prohibited, except under the police power. No one could uphold the high license or occupation tax levied on the sale of the "Police Gazette" and similar publications except under the police power; the high license or occupation formerly levied on ten pin alleys, and many other occupations and callings deemed hurtful to society.

In the law making the levy they were termed an occupation tax, as in this instance, but the laws were nevertheless but an exercise of the police power as is evidenced by their regulatory and prohibitive features. Laws of this character have always been sustained in this State. Mr. Cooley, in his work on Taxation, says: "A tax levied for the double purpose of regulation and revenue is founded in both police and taxing power." (Page 111.) This question is so fully and ably discussed in the opinion in the case of Fahey v. State, 27 Texas Crim. App., 146, and in the able brief of our Presiding Judge we merely refer to it for a citation of authorities and reasoning upon which such laws are sustained.

As said by Judge Rice in the Caswell case, supra: "It is abundantly shown by the Texas case that although laws of this kind may be called occupation tax measures, yet if the facts surrounding the subject show that it was intended as a police regulation, or if it is a subject coming within the police power, the authority of the State to deal with the subject will be measured by the police power of the State, and not by the taxing power."

It is said in Cooley on Taxation (3d ed. 412) that a license fee imposed upon a certain business has been sustained as a police regulation, though called a tax in the legislation which authorized it. (See also Coms. v. Roby, 8 Ire. (N. C.) 250; Coms. v. Patterson, 8 Jones (N. C.), 182; Com. v. Crowell, 156 Mass. 215; Cooley Const. Lim., 596; Vermont v. Harrington, 34 L. R. A. 100; Levy v. State, 161 Ind., 260; Thompson v. State, 17 Texas Crim. App., 257, and cases cited.

Another contention seriously made is that the law applying alone to territory where prohibition has been adopted, is, therefore, unconstitutional. In the original opinion we called attention to the fact that the people in adopting the Constitution recognized and appreciated the fact that different laws and different remedies would have to be adopted in territory where the sale of liquor was permitted and in territory where it was prohibited, and effect could not be given to the constitutional provisions in any other way. But in addition to this it has always been held that when license and occupation taxes are made applicable to all persons under the same conditions and circumstances, even though the license or tax might be higher under given conditions than under different conditions and circumstances. Thus in territory where the sale of intoxicants is permitted, the tax or license fee to engage in the business in the residence districts of a city or town might be placed at an amount that would be virtually prohibitive, while the license or tax to engage in the business within the business section was fixed at a less amount. Laws of this character have been upheld and are now being upheld in this State where the cities are authorized to fix saloon limits and refuse to license them in the prescribed limit, and yet grant them license to sell in the territory not prescribed in a reasonable amount. One living without the saloon limits is not de-

prived of any right or privilege that all under the same conditions are not deprived, and he will not be heard to complain that while he is prohibited from taking out license, or the tax is fixed so high as to render the business unprofitable, yet his neighbor living within two blocks of him, and not in the limits so fixed, can obtain license by paying a small tax. If there is any good sound reason upon which the classification is based, it will be upheld, and in this instance the reason is that the sale of intoxicants should not be permitted in residence districts, even though it is licensed and taxed in the business districts. And this rule of law applies not only to intoxicating liquors, but to many other dangerous and hurtful agencies, such for instance as prohibiting the erection of frame houses in the business districts, while they are authorized in residence districts. The reason being that the houses are so close together in the business districts that one endangers the other, and thus what are termed "fire limits" are sustained.

Is there any good sound reason why the storing of intoxicating liquors and the other liquors named in the law for others, should be prohibited in territory where the sale of intoxicants is prohibited, and yet is permitted in all territory where the sale is permitted? In territory where the sale is permitted and authorized it is a fact well known that intoxicating liquors must be stored as an incident to the business. Beer is kept stored in ice houses and necessarily so. Quantities of liquor must be kept on hand stored to supply the trade, special houses are built for storing intoxicating liquors, and keeping them properly, and the Legislature in licensing the sale of liquor where not prohibited appreciated this fact, and placed no additional burden on the persons storing it in such territory. But the circumstances and exigencies of the occasion are exactly opposite in territory where the sale is prohibited. There is no business followed in that territory that the storing of liquors is incident or necessary to, unless it be its illegal sale of such liquors, and, therefore, as in residence districts in the cities, the law is prohibitive in that territory. There is no distinction in the principle involved in the two laws; both are based on what is for the best interests of society and the welfare of the citizenship of the State. The classification, if it shall be so termed, is a reasonable one. The law is made to apply to all alike under the same conditions and circumstances.

The other questions we will not discuss as they are so fully treated in the original opinion. Since handing it down virtually all the questions have also been decided adversely to relator's contention by the Court of Civil Appeals in the case of Caswell and Smith v. State. In that case a writ of error has been denied by the Supreme Court. So it has been definitely fixed (as it had heretofore been) by the Supreme Court, the Court of Civil Appeals, and this court that the State under the police power has the right to prohibit any occupation or calling, or the sale of any article, that is harmful to society as a whole. For a list of authorities see Caswell & Smith v. State, supra, Ex parte Town-

send, and Edmandson v. State, supra, all of which have been decided recently.

The motion for rehearing is overruled.

*Overruled.*

DAVIDSON, Presiding Judge (dissenting).—I did not participate in the original decision of the case. However, upon motion for rehearing I have sought to give the questions involved a proper consideration in view of the fact that the result of that consideration has led me to a difference of opinion with my brethren. I have reached the conclusion, and am fully persuaded, that my brethren were originally in error and have wandered still farther in error in overruling the motion for rehearing.

I have read with a great deal of interest the brief and argument of counsel for relator, Messrs. Odell & Johnson, and S. C. Padelford, and believe they have so thoroughly covered the questions involved that it would be a useless consumption of time and work on my part to add to what they have said and written. These gentlemen have given the questions involved in this case thorough consideration, and have so thoroughly and ably briefed the different propositions that it is unnecessary for me to do more than to adopt the argument and brief as my dissenting opinion. The reasons urged by them, and the arguments advanced, and the authorities cited completely answer the majority opinion, and their reasoning remains so thoroughly and completely unanswered by that opinion I content myself with adopting it as my dissent and the reasons therefor. Their argument and brief are as follows:

"To the Honorable Justices of said court:

Now at this time comes the relator, Tom Flake, and makes this his motion for a rehearing herein, and prays the court to set aside the order and judgment of this court holding that the relator be remanded into the custody of the sheriff of the lower court, and in holding that Act No. 69, chapter 20 of the General Laws of the State of Texas, passed at the regular session of the Legislature of Texas, convening on January 12, 1909, and adjourning March 13, 1909—the said law being printed on pages 53-55 of the General Laws of the State of Texas, passed by the Thirty-First Legislature at its regular session—was constitutional, because under a proper construction of the Constitution of this State and of the United States, the said Act is plainly and unmistakably unconstitutional and violates both of said Constitutions, as is fully shown by the application for a habeas corpus, and for grounds of said motion for a rehearing, relator shows the following:

First. "The said Act of the Legislature mentioned above is unconstitutional in that it violates, and is repugnant to article 3, section 35 of the Constitution of this State, because there is more than one subject stated and embraced in the caption or title of said bill. The title of said bill embraces the subject of levying an occupation tax on the

business or calling of soliciting orders for the sale of intoxicating liquors within local option territory, and another and different subject which is the levy of an occupation tax on the business of conducting and carrying on what is commonly known as a cold storage, or following the business of any kind or character of bailment of intoxicating and nonintoxicating liquors within local option territory. These two businesses are separate and distinct. One relates to the sale of intoxicating liquors, and the other relates to the business of what is commonly known as cold storage, or the business of a bailor of intoxicating and nonintoxicating liquors, whether for hire or not in local option territory, and there being two subjects expressed in the title to the Act, it is violative of section 35, article 3 of the Constitution.

"This constitutional provision is mandatory and should be given a reasonable and plain and common sense construction, and the court erred in holding otherwise.

"Gunter v. Texas Land Mort. Co., 82 Texas, 502; State v. Mallinson, 82 Texas, 512; Cannon v. Hemphill, 7 Texas, 184; City of San Antonio v. Gould, 34 Texas, 49; State v. McCracken, 42 Texas, 383.

Second. "If the whole Act as construed by the court states a different object and purpose from that stated in the title or caption of the Act, then said law is void under article 3, section 35 of our Constitution. If, as decided and held by this court, this law under consideration embraces but one subject and object, which is the 'regulation and prohibition of the liquor traffic in territory where it has been prohibited,' then the subject of the law is altogether different from that stated in the title or caption of the Act, because the title or caption of the Act if given the broadest and most liberal construction, contains one subject, which is the levying of an occupation tax, or the taxing of the said businesses named in the caption. The caption must be construed by itself, and can not be aided by the law, or any outside matter, and you must give the words of the statute the meaning which is given to it not only by the law, but every other person, and giving it that meaning, the caption of the law contains but one subject, which is the taxation of certain businesses. This being so, if the construction of the law by this court is correct, and if the only subject, and the one subject of the law is the regulation and prohibition of the liquor traffic in territory where it has been prohibited, then the subject of the law is different from that stated in the title by the Legislature, and the law is void and unconstitutional, and this court erred in holding otherwise.

Remarks. "But if the title to this Act by giving it a very liberal construction, does contain the subject of the Act, then the subject of the Act is, and can be only that of levying an occupation tax, upon the several callings or professions mentioned in the caption and title of this Act. This Act mentions in clear, unmistakable language the subject of the law intended to be passed, which is the levying of an *occupation tax* upon the business of soliciting the sale of intoxicating liquors in

local option territories, and the levy of an occupation tax upon the business of what is commonly known as cold storage, or the bailment of intoxicating or nonintoxicating liquors, within local option territory, and providing for the enforcement of this tax.

"That is, by giving this caption or title the very broadest and most liberal construction which any court could give, the subject is the levy of an occupation tax on certain businesses and providing for the collection of this tax. The caption or title so states, and uses plain, well known, and unmistakable language. He, who runs, may read and understands what this caption says; it says it is for the purpose of *levying an occupation tax*. Everybody knows what an occupation tax is, even the Legislature of Texas.

"Now this court in this opinion for the purpose of holding this remarkable law constitutional, states that this law embraces but one subject, object, and purpose, to wit: 'The regulation and prohibition of the liquor traffic in territory where it has been prohibited.' (See near bottom page 3 of opinion.)

"The whole caption or title of this law is not quoted or referred to by the court, but it is in words as follows:

"'An Act to levy an annual occupation tax on the business of selling or offering for sale any intoxicating liquors by soliciting or taking orders therefor in any quantities whatever in any county, justice precinct, town, city or other subdivision of a county where the qualified voters thereof have by a majority vote determined that the sale of intoxicating liquors shall be prohibited therein; also levying an annual occupation tax for the keeping, maintaining or operating of any 'cold storage or any such place where intoxicating or nonintoxicating liquors or beverages are kept on deposit for others under any kind of bailment within the limits of any such local option territory, providing for the issuance of licenses and fixing penalties for the violation of this Act, and providing for injunction to prevent its violation, and declaring an emergency.'

"The second section of the title which refers to that section of the law under which relator stands indicted reads as follows: 'Levying an annual occupation tax for the keeping, maintaining and operating of any cold storage or any such place where intoxicating liquors or non-intoxicating liquors or beverages are kept on deposit for others under any kind of bailment within the limits of any such local option territory.'

"Now this court takes out the following in the caption, to wit: '*Levying an annual occupation tax for the keeping,* maintaining, or operating of any cold storage or any such place where intoxicating or nonintoxicating liquors or beverages are kept on deposit for others under any kind of bailment,' and substitutes the following therefore: 'The regulation and prohibition of the liquor traffic.'

"There is not one word in the title to the Act as given by the Legislature that is the same as any one word in the title, as constructed

by this court; that is, take the language of this court as to what is the subject and object of this law, and which must be incorporated and contained in the title, and there is but one word in this constructed title, which is in the title of the law passed by the Legislature.

"It is the law that the title must be construed with reference to the language used by the title itself, and not in view of the body of the Act itself; that is, the title must be construed by the language used in the title itself, and you can not even look to the body of the Act for the purpose of construing the title, and if the body of the Act is as this court construes it to be, then the subject of the body of the Act is not only stated in the title, but the title states altogether a different subject, which is the levy of an occupation tax.

"See People v. Joyce, 92 N. E., 607; 246 Ill., 124. We also refer your Honors to The State v. Coffin, 74 Pac., 962; McKellar v. City of Detroit, 57 Mich., 158; Fort Worth & Denver Ry. Co. v. Lloyd, 132 S. W., 899; Western Union Telegraph Co. v. State, 62 Texas, 630; Elliott v. The State, 91 Ga. 694; 17 S. E., 1004; McDuffie v. The State, 87 Ga., 687; 13 S. E., 596; Crabb v. The State, 88 Ga., 584; 15 S. E., 455; Knight v. The State, 88 Ga., 590; 15 S. E., 457; State v. Young, 47 Ind., 150.

"The title and caption to this Act relates *to the levy of an occupation tax,* and the only subject stated in the title relates to the levy of an occupation tax, and there is not one word in the caption which states that its subject is for the purpose of *prohibiting and regulating the trade in intoxicating liquors* in local option territory. In that portion of the caption, which is the latter clause of the caption, the caption refers to both intoxicating and nonintoxicating liquors; just as the caption in the Georgia cases, referred to above, stated that it was an Act to prohibit the sale of spirituous liquors, used the word spirituous or intoxicating liquors, and the Act prohibited the sale of intoxicating liquors in general of any kind or quality whatsoever. If the body of the Act is as this court construes it to be, and if its subject and object is the regulation and prohibition of the liquor traffic in territory where it has been prohibited, then the subject stated in the title is limited to the levy of an occupation tax on the businesses therein named and provided; that is, the subject as unmistakably and clearly stated by the Legislature in the title, is the levy of an occupation tax, and this court can not construe the levy of an occupation tax so designated by the Legislature, as to make the language of the Legislature altogether different, and to give it an altogether different meaning; that is, this court can not legislate by means of judicial construction, and substitute language in the title, which is not included in the title, and which has an altogether different and a broader meaning than the language used by the Legislature in the title and caption.

"Cooley on Constitutional Limitations, 7th ed., pp. 89-91, and especially the notes; Fort Worth & D. C. Ry. Co. v. Lloyd, 132 S. W.

Rep., 899; Gulf, C. & S. F. Ry. Co. v. Stokes, 91 S. W., 328; Fornia v. Frazer, 104 N. W., 147; Commonwealth v. Kebort, 61 Atl., 895.

"This court must take one of the horns of the dilemma. The caption states as the subject and object of this law the *levy of an occupation tax.* These are the words used by the Legislature to convey the precise meaning of the lawmakers, and this court can not substitute other and different language in this title, and the court can not even go to the body of the Act, as is shown by the authorities above, for the purpose of construing the title, and if the court can not go to the body of the Act for the purpose of contruing the title, then this court can not go to other and separate and distinct Act, and can not go into the vague realm of contemporary history, but the court must take the plain, unmistakable language of the title itself, and the plain and unmistakable language of the title itself is the *levy of an occupation tax,* and if the Act is not the levy of an occupation tax, but is a police regulation, then the body of the Act is altogether different from the title, which is the levy of an occupation tax, and consequently violates article 3, section 35, and is absolutely null and void.

"In construing not only the title to an Act, but in construing the body of the Act, wherever the language is plain and unmistakable, there is no room for construction, but the court must take the language of the caption, or the language of the law and give it its plain import and meaning. There is not a word in the caption, nor a sentence, nor a clause that is not plain and unmistakable. There is no ambiguity in the caption; it is consistent, plain, and unmistakable, and all that this court can do is to give this language its plain and unmistakable meaning, and if you do, it means nothing but the levy *of an occupation tax,* and the enforcement of its collection.

"The Fire Ins. Co. of Phil. v. Love, 101 Texas, 376; Missouri, K. & T. Ry. Co. v. Blanks, 125 S. W., 312; Blanks v. The Missouri, K. & T. Ry. Co., 116 S. W., 377; The State v. Tibbets, 52 Nebr., 228, 66 Am. St. R., 492; Brown v. Buck, 75 Mich., 274, 13 Am. St. Rep., 438; Cooley on Constitutional Limitations, pp. 88-91.

Third. "This court erred in not holding that this law was unconstitutional, and was in violation of article 8 of section 2 of the Constitution of Texas, which provides: 'All occupation taxes shall be equal and uniform upon the same class of subjects within the limits of the authority levying the tax.'

Remarks. "The caption of this Act unmistakably, directly and specifically states that it is the levy of an occupation tax upon certain businesses and callings. The body of the Act expressly and specifically states that it is the levy of a tax on these callings. The counties and the cities have no authority to levy a tax or to impose a license upon any individual corporation or person, except under article 8 of the Constitution.

"This statute levies a $2,000 tax on the callings and professions therein mentioned for the State. It authorizes the county to levy one-

half of this amount, or $1,000, as a tax, and it authorizes the cities to levy the same amount, and when levied by the county and the city it becomes a tax and collectible by the county and city as a tax, and the Legislature obtains the authority to authorize the cities and the counties to levy this occupation tax under and by virtue of article 8 of the Constitution, and this very law was passed and its provisions regulated in accordance with section 1, article 8 of the Constitution. In other words, this statute was passed under and in accordance with some of the provisions in article 8 of the Constitution, but it violates section 2 of this article, in that the occupation tax so levied is not uniform throughout the State of Texas. This court can not avoid this inhibition in the Constitution by *merely calling* the Act a police regulation. Calling it a police regulation does not make it so. The Legislature in the enacting clause calls it an *occupation tax,* and in the body of the Act, it calls it an *occupation tax,* and it authorizes the counties and the cities to levy the $1,000 each as an occupation tax, under that article of the Constitution so authorizing counties and cities to levy one-half of such an occupation tax.

"There is not only not one word in the title or caption of the Act that is obscure and unintelligible; there is not only no ambiguity in the caption or title of the Act, but there is not a word in the body of the Act that is obscure or unintelligible, and there is no ambiguity in the body of the Act. Any person of common knowledge and understanding can read and understand not only the plain and unmistakable title, but even the body of the Act. This court can not take plain and easily understood and intelligible words used by the Legislature and by the wizardy of construction eliminate these words and sentences, and substitute others than those used by the Legislature. Courts can not take the words used in the title of a statute, or in the body of the law, that have a plain, well defined meaning and significance, and by construction limit these words, and give them altogether a different meaning and significance, as we think this court has done, in order to hold this extraordinary law constitutional.

"The Legislature says in plain and unmistakable language that it is an *occupation tax law,* but this court in order to hold it constitutional construes the law to be a police regulation and not what the Legislature says it is. This court in passing upon exactly this same question in the case of 'Ex parte Woods, 52 Texas Crim. Rep., 575, 108 S. W., 1171,' held the principles of law contended for by us to be correct, yet this court in its opinion does not even allude to this case. It has been the holding of this court since 1876 that article 16, section 20, applied alone to the sale of *intoxicating liquors,* and that the majority vote in the localities therein mentioned could not prohibit anything else except the sale of intoxicating liquors. This court has also held that a law which prohibited, or levied a prohibitory tax upon the business of cold storage was inimical to our Constitution, and is null

and void; and the same holding has been held by the Supreme Court of West Virginia, and other States, as shown by the authorities cited in our argument heretofore filed, yet this court nowhere refers to and discusses the principles laid down in these cases, and the Woods case is the last case decided by this, or any other court in this State, where this identical question was raised and settled.

"In the Woods case, this court holds that that law, which is as much a police regulation as this, was a tax, and came squarely and directly contrary to section 2, article 8 of our Constitution. The general rule of construction holds that courts must give the language of a statute its plain and ordinary meaning. Our Legislature has given the court a rule by which to construe the statutes of this State. It is as follows: that the law 'shall be construed according to the plain import of the language in which it is written without regard to the distinction which is usually made between the construction of the penal laws and the laws upon other subjects.' Penal Code, article 9.

"This statute levies an occupation tax upon the business which is commonly known as cold storage, yet this court in order to hold this law constitutional construes this law so as to make it read as follows: 'That the *occupation tax* shall be levied upon any business known as cold storage where intoxicating liquors are deposited; that is, the statute uses this phrase: 'The business commonly known as cold storage.' There is nothing obscure in this. There is nothing unintelligible. It is plain language, and the Legislature says that the court must give to the words 'cold storage' the meaning that is commonly and generally given to that word. That is, the Legislature defines and points out what kind of a cold storage it means. It is one that is commonly or generally called cold storage, yet this court construing it gives the words a very limited and restricted meaning, to wit: a cold storage which is limited to the business of storing alone intoxicating liquors; that there is only one character of liquor which is stored in cold storages. If your Honors have ever been in a saloon, you must have observed that the great bulk of the intoxicating liquors and the most hurtful of intoxicating liquors are never put in cold storage; they are put in the shelves, and in the cases, and it is only the malt liquors which are put in cold storage. Whiskies, brandies, gin, chartreuses and other such intoxicating liquors are never put in cold storage. It is only the bottle and keg beer that is put in cold storage, and a place that is commonly called a cold storage is a place where very little beer is stored, as your Honors have given your personal experience about seeing the labels on tin top floating in tubs of water in certain ·local option districts in arriving at the construction of this law, we will state that it has been our judgment and knowledge that the regularly commonly known cold storage plants, even in such a local option town as Cleburne, did not follow the business of storing even keg and bottled beer, but that the few organizations or lodges, such as the Sons of Herman—fraternal organization—who were composed of Germans in Cleburne, and the Eagles,

because it was cheap and done for a favor, stored their beer. in the ice plants, and starved out the business and place commonly known as the business of cold storage in Cleburne. But the word 'cold storage' as commonly known *certainly, certainly,* does not mean the cold storage alone of intoxicating liquors.

"Again, this court in order to sustain this law construes in one place that nonintoxicating liquors mean intoxicating liquors, and in another place construes that the general term used by the Legislature of non-intoxicating liquors means nonintoxicating malt liquors. The Legislature divides the genus liquors into two divisions, which includes all liquors comprehended within this genus; that is, it puts a tax upon the bailment of the genus liquor, because intoxicating and nonintoxicating liquors including the whole genus, yet this court construes that one branch of this division which includes the whole genus should be limited to one separate, sole, distinct liquor—nonintoxicating malt ·liquor.

"The court says that the intoxicating liquors is plain and does not need any construction. Is intoxicating liquors any plainer than nonintoxicating liquors? Is there anything more to call for the construction of the word non-intoxicating, than for construing intoxicating liquors? The one is as plain and as intelligible as the other. Intoxicating liquors means all liquors which intoxicates; nonintoxicating liquors means all liquors which do not intoxicate. The one is as plain, as intelligible as the other, and if there is any difference at all, the nonintoxicating is plainer, simpler, and is more easily understood than intoxicating liquors, but if intoxicating is plain and simple, and does not need any construction, and if you know what intoxicating means, then you certainly know what nonintoxicating means, because it is just the opposite of intoxicating. If you know what intoxicating liquors ·are and what liquors are intoxicating, then you know that all other liquors are nonintoxicating, and the one word is just as simple, as plain, and intelligible as the other, and this court is driven to the extreme verge of construction, in order to hold this law to be constitutional, to make a difference in the plainness and intelligibility in the word intoxicating and nonintoxicating.

"This court arrives at the conclusion that the word nonintoxicating meant nonintoxicating liquors, where the Legislature uses it in its broadest sense to mean one liquor, to wit: nonintoxicating malt liquors, because one Mr. Cable introduced another law on the same day before the Legislature, which was passed on the same day by the Legislature, passed by Senate on the same day, and approved by the Governor on the same day, levying a tax alone on the sale of nonintoxicating malt liquors in local option districts, and because this man introduced into the Legislature and the Legislature passed, and the Governor approved this law in plain language limiting the tax to one liquor, the same man at the same time wrote this law, and the same Legislature at the same time passed this law, and the same Governor at the same time approved this law providing for a tax on the bailment of all non-

intoxicating liquors, and because in one instance they limited the tax to one liquor when it applied to the sale, the Legislature intended to limit the tax to one liquor, when applied to the business of bailment. It seems to me that the very converse should be true. If this man wrote the laws at the same time, and the Legislature passed them at the same time, and the Governor approved them at the same time making one law cover all nonintoxicating liquors, and restricting another law to one nonintoxicating liquor, all being done at the very identical same time, why is it that the Legislature limited one, and did not limit the other? And why is it that this court holds that the Legislature intended to limit all? That is, this court says that the Legislature in one law where it in effect used the word all intoxicating liquors intended to mean only one, because in another and a different law it said it taxed the sale of only one intoxicating liquor.

"Suppose a landlord should make a contract on a large farm with several tenants; the tenants to cultivate the farm exactly alike, but in his later contract made at the same time, and written by him at the same time, he granted to one tenant the right to use only the gray mares on his place during the tenanture, but to another tenant he granted the right that he might use all of the horses on the place during the tenanture, would this court construe that the contract where he granted the right to one of the tenants to use all of the horses, meant that he could only use the gray horses, merely because he specifically limited in another contract another tenant to the use of gray horses. If there was any mistake at all, the mistake would be as to the limitation, and in using the limited language instead of using the general language.

"We have read all of the authorities referred to and cited by your Honors, and we have not found one holding that where the Legislature in one separate and distinct law applied the law to the whole of a different subject, and then in a separate and distinct and other law applied it only to one species of that subject, that a separate and distinct law where the Legislature applied the law to the whole of a subject could be limited by this other separate and distinct law which applied it only to one subject, when the two subjects were different; that is, one of the subjects being a levy of a tax on one character of business, and the other law being the levying of a tax on another character of business.

"The only authorities which this court refers to is that old rule of construction where the law forbade the drawing of blood generally, and it was construed by necessity that it did not mean the drawing of blood by physicians to save life. In that character of cases the court gives the law its general meaning as used by the Legislature, but it excepts out of the general language used in the law these rare exceptions by necessity in almost unheard extreme cases; these cases do not hold that general language is and should be applied only to one specific isolated case, and that where the law uses general language a spe-

cific case from necessity is separated from and limited out of the general language. Here the court calls in question a rule for which it has not a precedent, even in these extraordinary cases. We venture to say that there is no case where the general language of the law defining a genus is made to mean, and is made to apply only to one specific item or species as this court does in this case.

"On page 15 of the opinion of this court near the bottom of the page this court commences to give what it conceives to be the meaning of the following words: 'The business of keeping, maintaining, or operating what is *commonly known as a cold storage* or any place by whatever name known, or whether known or not where intoxicating, or nonintoxicating liquors or beverages are kept on deposit for others.' The court admits that if the construction and meaning which relator seeks to give to the word *intoxicating and nonintoxicating* the Act is invalid under the Constitution, and the court had prior to this portion of the opinion stated that it was not necessary to give any construction to the phrase 'intoxicating liquors' as the words defined themselves, but the court conceives that there is some obscurity or ambiguity about the words nonintoxicating liquors, and proceeds to construe that phrase when the law of all the courts is that where words are plain and intelligible, there is no necessity for a construction, but this court in arriving at the meaning of the phrase nonintoxicating liquors, refers to Webster's Unabridged Dictionary for a definition. The plain import of the language used is the statutory rule prescribed in Texas Penal Code, article 9.

"As is shown, Mr. Webster gives two definitions: 1st: 'Any liquid or fluid substance as water, milk, blood, sap, juice, and the like; 2d: especially alcoholic or spirituous fluid, either distilled or fermented.' Here Mr. Webster stops in his definition, and the court holds that by the word liquor in the statute the Legislature meant solely and alone the second definition. In this clause, this court is very unfortunate, because this court gives to the second limited meaning and definition of the word given by Mr. Webster, the wrong meaning; that is, the court gives too great a scope and too extended a signification to the second definition, one greater than given by Mr. Webster himself. In other words, the word liquor has two meanings or significations, one a general and one a specific or limited meaning, according to Mr. Webster, and according to the usual common signification of the word; when we use the word liquor as applied to drinking, we always mean intoxicating liquor—that is its limited sense. The dictionary and encyclopedia that is most often used by the courts of this country in defining words is that of the 'Century Dictionary and Encyclopedia.' It is more extended than that of Mr. Webster's, and this authority is adopted by the Supreme Court of the United States and others. The Century gives four significations or definitions of the word liquor—1st: a liquid of fluid substance as water, milk, blood, sap, etc. This first is the same definition as given by Mr. Webster; 2d: 'A strong or

active liquid of any sort.' Under this second definition this authority five more limited or specific meanings of the word liquor designated (a) · (b) (c) (d) and (e) and then it gives another more limited and qualified meanings of the word liquor where it is qualified and limited by an adjective, or other word. In the subdivision (a) the definition is given as follows: 'A alcoholic or spirituous liquid either distilled or fermented, and intoxicating beverage, especially a spirituous or distilled drink, as distinguished from fermented beverages, as wine, beer.' Then it gives four other limited specific meanings to this word, and then it gives the other meanings of the word qualified by adjectives as 'boiled off liquor' 'gas liquor,' 'malt liquor,' 'spirituous liquor,' etc.

"According to the Century Dictionary the second definition or signification of the word as given by Webster means an intoxicating spirituous or distilled drink as distinguished from fermented beverages as wine and beer. That is, subdivision (a) of the second definition of The Century Dictionary of liquor, limits the word not only to an intoxicating liquor, but to a spirituous or distilled intoxicating liquor eliminating fermented beverages such as beer, wine, etc. In other words, the Century Dictionary and Encyclopedia states that Webster's definition of it eliminates malt drinks altogether. This definition is adopted by the Supreme Court of the United States, but this definition of Webster has received the construction of other courts.

"In the case of Dolan v. McLaughlin, the 64 N. W., 1076-1078, on page 1078, the court gives the following definition of liquors, quoting from Webster, and showing exactly what Webster means in his second definition, which has been adopted by this court. In the above decision the court uses the following language: 'The word (liquor) is defined by Webster (1) Any liquid or fluid substance as water, milk, blood, sap, juice, and the like. (2) Especially alcoholic or spirituous fluid, either distilled or fermented, as brandies, whiskies, wine, beer, etc.' 'If the witness in describing what liquor had been sold to McLoughlin had uniformly described it merely as liquor, it might be proper for the jury to assume that it was in that class specifically referred to in the second definition above given, that is Webster's definition, but this was not the case. There was evidence that the liquor furnished by Dolan to McLoughlin at least on one occasion was seltzer, and within one of the definitions given above seltzer is clearly embraced. Under these circumstances it was error to instruct the jury that whatever liquor is shown to have been sold in a licensed saloon is presumed to be intoxicating.' That is, this court holds that Webster's second definition is just as the second definition in the Century, and applies solely and alone to intoxicating liquors.

"In the case of Brass v. The State, 34 Southern, 308, the Supreme Court of Florida in giving the meaning of liquors as defined by Webster in his second definition adopted by this court, uses the following language: 'Does the omission of the word *'intoxicating'* before the word *liquors* in the form of information provided for by the Statute

infringe this rule? We think not. The word liquor may be used in either of two senses. The first is practically synonymous with liquid, as the second as given in Webster's Dictionary is second specifically alcoholic or spirituous *fluid* either distilled or fermented, as whiskies, brandies, wine, beer, etc. In common parlance the word is uniformly understood in the latter sense when used as it is here in speaking of a dealer in liquor. This being true when the statute first prescribes a penalty for dealing in intoxicating liquors, and then prescribes a form of indictment to be used in prosecuting for a breach of this law, using therein only the word liquors, it is beyond cavil that the word is used in the special sense of intoxicating liquors as above defined.' (By Webster, meaning Webster's second definition.)

"And that under such an indictment the sale only of such liquors can be shown.

"In the late case of Carswell v. The State, 66 S. E., 488, the Supreme Court of Georgia has defined the word liquor as follows: 'It is true that the word liquor has more than one meaning, and that in the broad sense it included any liquid or fluid substance such as water, milk, blood, etc., but it has also the special sense, and meaning, of an intoxicating beverage.' The Century Dictionary after giving the general meaning gives also the definition; 'a strong or active liquor of any sort, especially an alcoholic or spirituous liquid, either distilled, or fermented; an intoxicating beverage, especially a *spirituous or distilled* drink as distinguished from *fermented* beverages as wine and beer.'

"Further on in this definition is cited a quotation from Shakespeare —Hamlet 5, 1-68. 'Fetch me a stoup of liquor.'

"It is said in the discussion of the definition that the words used absolutely has meanings different equal to the industry in which it is used;·that is, the second definition as given by Mr. Webster, and which is adopted by this court, is held by all of the courts to mean an *intoxicating liquor*, and by two of the courts—the Supreme Court of Georgia, the Supreme Court of the United States, and by the Century Dictionary as *a spirituous intoxicating liquor*, excluding even a *fermented* intoxicating liquor. So the definition of *unintoxicating liquor* given by your Honors means an *intoxicating liquor*. In other words, Webster's second definition covers that phrase in the law covering *intoxicating* liquors, and you have got to go to the first definition of Webster to get your unintoxicating liquor. Where can your Honors go now for a definition of unintoxicating liquors? You have to go to the first definition of Webster, or the broad general second definition of the Century, because the second definition of Webster means an *intoxicating liquor*, and Mr. Webster gives only two definitions of liquor, and in his definition divides the *genus liquor* into two great classes; the *second* covers *intoxicating liquors*, and consequently the first must cover and does cover nonintoxicating liquors; that is, the Legislature in this Act divides up the genus liquor exactly as Mr. Webster does into intoxicating and nonintoxicating liquors, which covers all liquors and the

second definition of Mr. Webster covers intoxicating liquors, and the first covers nonintoxicating liquors.

"Further, the Century says that when you refer to a man as being in liquor, you mean he is drunk, and everybody knows what you mean when you use the expression that an individual is 'liquoring up.' You mean, he is getting drunk, and drinking intoxicating liquor. Everybody knows what you mean by a liquor dealer. You mean a dealer in intoxicating liquors. If the statute had merely used the word liquor, then this court could apply to it the second definition of Webster, which would mean an intoxicating liquor, but the Legislature as we have stated above, gives both of the significations or definitions that are given by Webster giving the intoxicating liquor covering his second, and the unintoxicating liquors which would cover the first, or a large portion of the first, and how this court can take Webster and make intoxicating liquor, the second definition, mean a nonintoxicating malt liquor, is beyond our feeble comprehension.

"We think that this court was a little unfortunate in using Webster's definition, as Webster's definition, and the definition of the Century Dictionary, both of which are authoritative, and sanctioned by every court in the American Union, and the United States Supreme Court, holds that the word *liquor* in its special or secondary sense, and in the sense in which Mr. Webster used it, means an intoxicating liquor, and excludes nonintoxicating liquors, and the first definition of Webster means all nonintoxicating liquors, and our statute by putting a tax on the bailment of intoxicating liquors covers all of the liquors included within the second definition of Webster, and when it put it on nonintoxicating liquors also, it included all, or at least a large portion of the liquors included within the first definition of Webster. This court has cited a large number of authorities, such as the Mugler case, and the Munn case, and the other cases holding that a State has the right under its police power to prohibit the sale of intoxicating liquors. The only question decided in the Mugler case was that the State of Kansas had the power to adopt a constitutional amendment prohibiting the sale of intoxicating liquors within that State, and that such a prohibition was not inimical to the fourteenth amendment to the Constitution of the United States. We have not and do not question these decisions.

"We, in no portion of our argument, in the least degree attempted to call in question the Constitutionality and the validity of section 20, article 16 of our Constitution. This article authorizes the different localities under a proper Act of the Legislature to prohibit the *sale* of intoxicating liquors within the limits of certain subdivisions of our State. This section of the Constitution and all of the laws passed to prevent the *illegal sale* of intoxicating liquors within local option territory are constitutional and valid. Our laws make ample provision for punishing those who make illegal sale of intoxicating liquors within local option territory, and the Act of 1907, also makes it illegal, and absolutely prohibits any person who keeps on deposit—that is, any

bailor—who holds or possesses or keeps intoxicating liquors within local option territory for the purpose of illegally selling same, so the wrongful and illegal bailment of intoxicating liquors in local option territory is absolutely forbidden by another and a separate and a distinct law. This court will not accuse the Legislature of so silly an act as to levy a tax upon an illegal bailment of intoxicating liquors. A law making illegal the bailment of intoxicating liquors in local option territory for the purpose of evading the law that is for the purpose of making and furthering illegal sales of such liquor has heretofore been passed, and is now in force, so an illegal bailment of intoxicating liquors within local option territory was and had been long prior to the enactment of this law fully covered and provided for. This court must hold that the Legislature would not license—that is, render lawful—because the word 'license' means to make and to render lawful an unlawful act. It had already rendered unlawful any bailment of intoxicating liquors within local option territory kept and held for the purpose of evading the local option law, and rendered the places where such liquors were kept as nuisances, and places which the public authorities can abate. This being so, this tax is levied only upon a cold storage business that is run illegally, and that does not affect the illegal sale of intoxicating liquors in local option territories. It levies a tax upon the bailment both of intoxicating and nonintoxicating liquors, where the bailment is not for the purpose of aiding in the illegal sale of intoxicating liquors in local option territory, consequently this law applies and the business can be run and as legally run and conducted in local option territory as it can in territories where local option does not prevail. The business that is taxed in this case is a business that can be lawfully run throughout the borders of the State of Texas.

"If the court, or any one else will read the caption of this Act, and then read the Act itself, that is, the second clause or section of the Act, which is only involved in this case, it is an *occupation tax* upon a legitimate business, which can be conducted and pursued not only in local option territories but in all other portions of our State. This is the outward plain meaning that is derived, and can only be derived from the language of the Legislature in the Act, and in its title, but this court by going out and hunting up what it calls contemporary history, and by making visits into local option territory, and examining tubs of water with ice in them, and with bottles of 'U know' and 'I know' and 'We all know' with labels floating on the top, conceives that the Legislature had some kind of an intention beneath and ulterior to the intention which is manifested by the plain and unmistakable language of the law; that is, that the Legislature although from the language of the statute it enacted a law which levied an occupation tax upon a lawful business, yet that the ulterior intention of the Legislature was by this method to use apparently the power conferred upon it by the Constitution to levy an occupation tax upon a legitimate business to use this power for the purpose of aiding in the enforcement

of the criminal laws of this State affecting the enforcement of the local option law, that is, the Legislature by the wording of the caption of this section of the statute, apparently and outwardly calls into requisition a power conferred by the Constitution to levy a legal tax upon a legal business, but its concealed intention was to use the taxing power for the purpose of enforcing the local option law; the Legislature could not directly and squarely forbid the bailment which it taxes in this law, because it would be unmistakably unconstitutional, but it takes and covers up its ulterior motive under the guise of the legal tax to accomplish that which it could not do directly. That is, the Legislature veils its true purpose and holds out to the public the hands of Esau while in truth and in fact it speaks with the voice of Jacob. That is, this is the intention which this court construes that the Legislature means and this court has to go out and away from the language of the Act and its title, and into what it calls contemporary history, and to another Act of the Legislature in order to give and confer upon this Act this veiled purpose and intention of the Legislature. This is the very character of legislation which the Constitution condemns and it is this character of legislation that the highest court of this State should unequivocally condemn, and it is for this very reason that our Constitution provides that the Legislature shall state in the title of every enactment the true subject which is to be incorporated in the law.

Fourth. "This court erred in holding that this Act was not in contravention of section 3, article 1 of the Constitution, and section 17, article 1 of the Constitution, and section 19, article 1 of the Constitution of the United States, because every citizen of Texas has the right to follow the business of cold storage and bailment of intoxicating or nonintoxicating liquors in every county and State, so that he does not infringe or violate any law of this State; that is, every citizen has the right to pursue the callings taxed in the second section of the Act in every county of the State just so he does not follow this business of bailment for the purpose of aiding in the illegal sale of intoxicating liquors in local option territory, and this law places this prohibitory tax upon these lawful businesses alone in certain sections of the State of Texas, and allows the citizens of other portions of Texas to follow these lawful businesses without let or hindrance, and without price.

Fifth. "This court erred in holding that this law was not inimical to the fourteenth amendment to the Constitution of the United States, because this law does deprive the citizens of the United States living in local option territories of the right and privilege of that business commonly known as cold storage, and the business of the bailment of intoxicating and nonintoxicating liquors within local option territory, and the Legislature of this State has made a discriminating classification against the citizens of local option territories, who are citizens of the United States, and deprives them of valuable property rights, and

the inalienable rights of the liberty of a free man in following a legal and legitimate business.

Sixth. "This court erred in holding that this Act was not in violation of, and inimical to section 13, article 1 of the Constitution of the State of Texas. This court referring to the fact that the Legislature punishes the business of the illegal sale of intoxicating liquors within local option territory by confinement in the penitentiary, and holds that such a punishment is not excessive. We agree with the court in this conclusion, but the punishment that is inflicted in this case is a punishment merely for the failure to pay an excessive tax on legitimate business. The one is the wilful violation, and the heedless and reckless disregard of a criminal law of this State. This is merely the failure to pay a tax, and an unreasonable and unconscionable and illegal tax. In addition to authorities cited in our former argument we cite Busch & Co. v. Webb, 122 Fed. Rep., 655, 669.

Seventh. "This court erred in holding that this law did not not only violate the Constitution of this State, but the Constitution of the United States."